Bartlett *v.* Drew.

———————•••———————

FANNY S. BARTLETT *vs.* DANIEL DREW, impleaded, &c.

An action in the nature of a judgment creditor's bill is still allowable, under the Code.

Hence a judgment creditor of a foreign corporation, after an execution has been returned unsatisfied, may bring a suit in equity against an individual having property of the corporation in his possession, in this State, to reach such property and subject it to the payment of the judgment.

*Osgood* v. *Laytin,* (5 *Abb. N. S.* 1,) has no application to such a case, being on the statute of this State.

APPEAL by the defendant Drew from a judgment entered upon the report of a referee.

The plaintiff, in April 1866, recovered a judgment in this court against the New Jersey Steam Navigation Company, a common carrier of goods and passengers, for $836.32, damages and costs, for the value of her trunk, lost by the negligence of said company. And an execution issued upon said judgment having been returned unsatisfied, the action was brought to enforce the payment of said judgment out of property of the said corporation in the possession of the defendant Drew, in this State.

The referee found the following facts:

*First.* That the New Jersey Steam Navigation Company was and is a corporation incorporated by and under the laws of the State of New Jersey, as in the complaint is alleged, and its business, under its charter, was that of a common carrier, transporting passengers and freight be-

tween New York and eastern ports, by steamboats, for hire.

*Second.* That the plaintiff duly recovered the judgment against the said The New Jersey Steam Navigation Company, in the court, in the manner, and at the time, and upon the ground and for the amount, as in that behalf is alleged in the complaint, and after a trial in said action upon the issues therein; that an execution was duly issued upon such judgment to the sheriff of the city and county of New York, which was returned wholly unsatisfied before the commencement of this action, at the time and in the manner alleged in the said complaint.

*Third.* That the defendant Daniel Drew, at the time of the recovery of such judgment and the sale and distribution hereinafter mentioned, was a stockholder in the aforesaid corporation, holding 1966 shares of the capital stock of the said company, of the nominal par value of $100 each share, the whole number of the shares of said capital stock being 5000.

*Fourth.* That the steamboats *Commodore, Commonwealth* and *Plymouth Rock,* the property of the said company, were, in December 1863, all sold by said corporation as follows:

| | |
|---|---:|
| The *Commodore* for . . . . . . . . . | $150,000 |
| The other two, each for $300,000, making . | 600,000 |
| Total amount of said sales, . . . . | $750,000 |

These sales were made by order of the board of directors of such corporation, of which board the defendant Drew was then a member, and also president of the company, and he signed the several bills of sales thereof by like order.

*Fifth.* That in or about December 1865, the proceeds of the sales of said several steamboats were, by order of the board of directors, divided among the several stockholders of the said corporation of which the said defend-

ant Drew was one, and on such distribution said Drew, as such stockholder, received on the shares held by him his proportionate part of the proceeds of said sales, to an amount exceeding the claim of the plaintiff.

*Sixth.* That the parties in that behalf named in the answer of the defendant Drew herein, were, at the time of such distribution, stockholders in said corporation, and resided as in the said answer in that behalf alleged, and they each received their proportionate share also of the dividends of such moneys, as in the answer is set forth.

*Seventh.* That the plaintiff, immediately after the loss of her trunk, in July 1863, for the loss of which she recovered the judgment set out in the pleadings herein, gave notice of her loss to the said corporation, and made reclamation upon it therefor.

*Eighth.* That there are no assets of the corporation aforesaid upon which execution under the aforesaid judgment can be levied.

Upon the foregoing facts, the referee found as matters of law:

1st. That the plaintiff was entitled to judgment; that the parties in that behalf named in the third count or statement of a defense in the answer of the defendant Drew, were not necessary parties defendant in this action, jointly with the defendant Drew, and that there was no defect of parties defendant.

2d. That the plaintiff was entitled to recover judgment against the defendant Daniel Drew for the sum of $836.32, with interest thereon from the 17th day of September, 1866, making a sum total up to the date of the report of $1055.52, together with costs. And he ordered accordingly.

*Charles Jones,* for the appellant.

I. The complaint of the plaintiff should have been dismissed. 1. It does not appear that the assets of the com-

pany are exhausted. It is a New Jersey corporation, and there may be sufficient assets in the possession of the corporation to pay all the claims. The mere fact that there is no property in the State of New York upon which execution could be levied, is not sufficient to show that the company had no assets. 2. The action is substantially to wind up the affairs of the company, which is beyond the jurisdiction of this court. This is clearly the effect of the action, for it could not be determined what share or part of the assets the plaintiff should have, if any; whether they had been divided, or not, until the total amount of the assets, as well as the amount of the indebtedness of the company, had been ascertained. 3. The plaintiff, in her complaint, called for the names of the stockholders who participated in the dividend, or sought to excuse herself for not making them parties, and the defendant furnished, by his answer, the names of all the stockholders. By the plaintiff's failure to make them parties defendant, there is a defect of parties defendant. (*a.*) It is admitted that the money the plaintiff is endeavoring to obtain was paid regularly as a dividend. (*b.*) But it was paid to a number of parties known to the plaintiff, who (if anybody is liable to her) are all liable; and it is no answer to this to say that the present defendant has relief over against the other stockholders, for the law avoids circuity of action. (*c.*) And the equitable lien claimed by the plaintiff (if there be any) was upon the entire property or assets of the company, and not upon any particular part of it.

II. The plaintiff has no standing in a court of equity which entitles her to any relief therein. 1. Equity merely supplements the law, and is intended only to furnish relief where the party has a legal right, claim or lien which he cannot enforce at law. 2. The plaintiff, in December 1863, had no ascertained legal right or claim, nor any lien against the said company, or against the assets of said company, or against the part of its assets which she claims

---

Bartlett *v.* Drew.

---

was divided among the stockholders. (*a.*) She was not a creditor of the company; she merely claimed that she had an unliquidated' claim for baggage lost, which might amount to nothing if the baggage were returned. (*b.*) Before she commenced her action, three years had elapsed since the money she desires to obtain was paid as a regular dividend to the defendant. She did not commence her action until 1866. (*c.*) A mere claim for unliquidated damages, when even the liability of the company was not determined, cannot prevent the directors of a company from declaring a dividend. 3. The dividend having been properly and legally made, the equity of the stockholders, who received their money under said dividend, is higher than any equity of the plaintiff. 4. The law provided the plaintiff an ample remedy (by attachment) which she neglected to use, and can she now come into a court of equity and ask that the rights and equities of every one else shall be disregarded, when, but for her laches, no such rights or equities would have accrued?

III. The plaintiff's action is not properly brought, and cannot be sustained. 1. If the New Jersey Steam Navigation Co. is solvent, then the present action will not lie, for then the plaintiff can obtain her relief at law. 2. If the company is insolvent, then the plaintiff is not entitled to any relief in this action. (*a.*) The assets of an insolvent corporation belong to creditors equally. It is proved that there are other creditors. It is not proved that all the assets distributed will pay the debts. (*b.*) The only person who can sue and recover (if anybody) any assets belonging to an insolvent company, which have been distributed as dividends, is a receiver. (*Osgood* v. *Laytin*, 5 *Abb. N. S.* 1.) (*c.*) A dissolved insolvent corporation must be wound up, and its assets equitably distributed among its creditors. This can, in this case, only be done in New Jersey. (*Barclay* v. *Talman*, 4 *Edw.* 123.) (*d.*) Besides, this corporation having been dissolved, the court will pre-

Bartlett *v.* Drew.

sume that a receiver has been appointed in New Jersey to wind it up.   3. It does not appear, and is not proved, that there were not sufficient assets of the company to satisfy the plaintiff's claim, after the dividend of the proceeds of sale of the steamboats *Commodore, Plymouth Rock* and *Commonwealth* was made, this being the only dividend made, so far as the proof discloses.

IV. There being no law of this State making the stockholders, in such a case as the present, individually liable, and no such law of New Jersey having been proved, and as by the common law they would not be liable, it follows that if the plaintiff has any relief against the stockholders it is because they have property of the company in their hands.   1. But if they have such property, and the plaintiff or other creditors have any claim therefor, the defendants and the other stockholders must hold that property as trustees, and the plaintiff and all other creditors must be the *cestuis que trust.*   2. But a trust is an entirety.   An action cannot be brought by one *cestui que trust* (where there are several) against one trustee, (where there are several.)

V. All the assets of said company in the hands of the defendant Drew came to him under a regular dividend made and declared by the directors while the company was solvent, and after paying all known and liquidated debts, and he can hold such dividends, (*Le Roy* v. *Globe Ins. Co.*, 2 *Edw. Ch.* 657;) certainly as against everybody but a legally appointed receiver.

VI. No person can bring an action against a stockholder to recover back a dividend already paid, except a receiver.   (*Osgood* v. *Laytin*, 5 *Abb. N. S. p.* 1.)

VII. A dissolved corporation must be wound up, and it can be wound up only in the place of its domicil, which in this case is New Jersey; but in New Jersey the common law prevails, and by that law the debts of a corpora-

tion, upon its dissolution, are extinguished. (6 *Jones' Eq.* 345.  3 *Durnf. & E.* 241.)

VIII. By the charter of the company it is not provided that the stockholders shall be individually liable; there is no law of this State that they shall be, and the court cannot impose a liability which did not exist by the original charter.

IX. The court will always take notice of its own officers. In this case a receiver was appointed by an order filed and entered at the time the action was commenced; and if the defendant has not title to any property in his hands which belonged to the said company, then the title is in the receiver.

*E. P. Cowles,* for the respondent.

I. By the general law, the capital stock of every corporation is primarily liable for the payment of its debts.  It cannot legally be diverted from that purpose and distributed among its stockholders, leaving the creditors unpaid, or unprovided for.  This principle is fundamental, and needs neither argument nor illustration to support it. (*But see* 2 *Kent's Com.* 307; 2 *Story's Eq. Jur.* 1252; *Curran* v. *State of Arkansas,* 15 *How. U. S.* 528.)  It necessarily follows, therefore, that the act of converting the assets of the New Jersey Steam Navigation Company into money, and distributing the proceeds among the stockholders, was a fraud upon the rights of the plaintiff, as a creditor of the company.  In principle, and in law, it is the same thing as the act of a natural person in disposing of his property, by gift or otherwise, without first providing for the payment of his debts.  In either case, the act is wrongful and fraudulent, as against creditors.

II. To obtain redress and enforce payment of her judgment, the plaintiff may, at her option, proceed against the whole body of stockholders who participated in the wrongful distribution, asking for *pro rata* contribution from

each; or she may proceed against any one of them severally, and make reclamation upon him to the extent of his participation in the distribution, or of so much of it as may be requisite to satisfy her judgment. She may, if she so elect, proceed against all, since all participated in the wrong, and they could not object that she brought them all in, and sought only a *pro rata* contribution from each; because that would be an assertion of her rights in the mildest (as to them) and most moderate form. But, she may also proceed against any one of them; and particularly may she do so as to Mr. Drew, without calling any of the other stockholders into court. Because, as against her, each participating stockholder holds his part of the distribution unlawfully, wrongfully, as participant in a fraud upon her rights. And particularly is this so as respects Mr. Drew. He was the president of the company. He was also one of the directors, and its largest stockholder. He was not alone bound to know or ascertain the existing debts, and to see that they were paid before distribution of the entire assets, but he did know of this particular claim; for reclamation on the company was made by the plaintiff immediately after the loss. He personally (in his official capacity) made sale of the property of the company, and received the proceeds before distribution, and has retained to his own use nearly two-fifths of the whole $750.000. As against the plaintiff, no one of the stockholders had any legal right to receive his portion of the company's capital until she was paid; and consequently each one incurred, by the very act of receiving it, a liability in equity to account to her, which was several as to each one, to the entirety of his portion of the distribution. Her equitable lien was on the whole which each one received, and upon every part of it. The defendant insists that these participating stockholders, if liable at all, are liable only to a judgment requiring them

to contribute each, *pro rata*, and so sets up the non-joinder of twenty-two other parties. The fallacy of this position is made apparent by the hardship and consequent loss it might entail upon the plaintiff; for if it were true, that the stockholders of a corporation could absorb to themselves all of the corporate assets, leaving creditors unpaid, and the creditor, in seeking redress, should be held justified in enforcing a *pro rata* contribution only from each participant, then in case any one of them, or more, should be beyond the jurisdiction of the court, or be insolvent, the creditor would necessarily suffer loss, to the extent of the *pro rata* share of each such party. The right to be exempt from any but a *pro rata* liability applies only in favor of innocent parties.

No party to an act which the law deems wrongful or fraudulent, entitles one of the several participants in a wrong, when sued for the consequences of the joint wrongdoing, to insist that his fellows shall all be brought in, in order thus to protect himself against the full legal consequences of his act. (2 *John. Ch.* 131. *Vose* v. *Grant,* 15 *Mass.* 518.) One invoking, in a court of equity, the application to himself of an equitable rule, like that of protection from anything more than a *pro rata* contribution, must stand before the court with clean hands, and be able to show an equitable right to such modified or restricted liability. This is not the case where the defendant has helped absorb to himself, in conjunction with others, an entire fund, upon the whole of which the party suing him had a claim prior and superior in equity over himself and the other participants in its diversion and division. The suit was therefore properly brought, and the plea of non-joinder correctly overruled.

III. The plaintiff was under no obligation to sue in the name of, or for the benefit of all other creditors of the New Jersey Steam Navigation Company. (*Hendricks* v.

Bartlett *v.* Drew.

*Robinson*, 2 *John. Ch.* 283. *Edmeston* v. *Lyde*, 1 *Paige*, 637. *Parmelee* v. *Egan*, 7 *id.* 610. *Reubens* v. *Joel*, 13 *N. Y.* 488.) With that company, in its relation to the other creditors, the plaintiff has no concern. She is simply a judgment creditor against it, and as a diligent one, is seeking to enforce her judgment by that most ordinary of remedies, a creditor's bill.

It is not a case of the marshalling of assets for general participation therein by all creditors of the company; nor does the plaintiff hold any fiduciary or other relations with any other creditors of the company, if any such there are, nor is it alleged or shown that any other creditor of the New Jersey Steam Navigation Company has obtained judgment, and had execution returned unsatisfied.

IV. The fact that the New Jersey Steam Navigation Company is a foreign, not a domestic corporation, is, for all the purposes of this action, immaterial. This is in no sense a proceeding to marshal the assets of the company, nor to wind it up, nor enforce against it a penalty or remedy given by any special statute of New Jersey. It was sued in the courts of this State; appeared and pleaded; had a trial on the merits; and judgment was recovered against it. If it had property within this State, which an execution could reach, it will not be questioned that the sheriff could seize and sell it. If any individual has in his hands property within the jurisdiction of the court, part and parcel of the company's assets, which equitably should be applied upon the judgment, equally can a court of equity, in aid of the execution, take and so apply, or command and adjudge it to be so applied. The principle is the same in both cases; that is to say, whether the court, through the sheriff, seizes or sells property, or through its equitable powers takes money found in the defendant's hands, and applies that upon the judgment. In short, a judgment creditor's bill is but an equitable execution.

---
Bartlett *v.* Drew.
---

*By the Court,* CARDOZO, J.    This action is not brought upon the theory that any statute has been violated by Mr. Drew receiving a portion of the property of the New Jersey company.    The statute of our State, in that regard, is inapplicable to a New Jersey corporation.

The object of this action is not the dissolution of the corporation; but it is to reach, in the hands of a person who has possession of it, some of the property of the corporation—the judgment debtor—and subject it to the payment of the plaintiff's judgment.    This is a very common proceeding under a judgment creditor's bill—which this in effect is—and is still allowable under the Code, (§ 142, *Voorhies* 10*th ed. p.* 175, *note a.*)

*Osgood* v. *Laytin* (5 *Abb. N. S.* 1,) has no application, being on the statute of this State.

I think the judgment should be affirmed.

Judgment affirmed.

[FIRST DEPARTMENT, GENERAL TERM, at New York, November 7, 1871. *Ingraham,* P. J., and *Cardozo* and *Geo. G. Barnard,* Justices.]

# In Memoriam.

---

### Hon. HIRAM DENIO, LL. D.,

FORMERLY CIRCUIT JUDGE AND VICE CHANCELLOR FOR THE FIFTH
  CIRCUIT, AND JUDGE OF THE COURT OF APPEALS, DIED AT HIS RESI-
  DENCE IN THE CITY OF UTICA, ON THE 5TH OF NOVEMBER, 1871,
  IN THE 73D YEAR OF HIS AGE.

---

A meeting of the Bar of Oneida county was held at the court
house, in Utica, on the following day.   It was called to order by
Judge BACON, on whose motion Hon. A. S. JOHNSON was
appointed chairman, and on motion of Addison C. Miller, Esq.,
Messrs. Beardsley and Beebe were made secretaries.

Judge JOHNSON, on taking the chair, spoke as follows:

The occasion which calls us together, is one of unusual solem-
nity.   Yesterday, about eleven o'clock, HIRAM DENIO departed
this life, while prayers for his health were being offered in the
church where he had been accustomed to worship.   Few men
are so successful as was he in his judicial life.   Every one
respected him for his attainments; every one loved him for the
qualities of his heart.   For twelve years he sat on the bench of
the Court of Last Appeal, in this State, and his services to the
profession and the commonwealth, while there, were invaluable.

It was my happiness to be upon that bench when he came,

and I know how welcome were his strong head and warm heart; and how unreservedly he ·gave every talent to the duties of his profession.    It may be said of him, at the least, that he was the equal, in ability, of any legal mind in the State.    When his first term of office expired, it was his desire to retire from the bench and from public life.    He always manifested a disposition to anticipate the time when he should be unable to do justice as he thought justice should be done.    He accepted the nomination with the understanding that he could resign if, at any time, circumstances should require.    Happily, none such occurred.    He served for eight years, and returned to Utica to finish his days in peace.    He suffered from a paralytic attack in October, 1868. All of you will remember how the blow fell upon his associates. From that attack he never fully recovered, although his powers of mind remained unimpaired up to the close of his life.    It is · only four weeks since he was obliged to deny himself the pleasure of receiving his friends.    He fell asleep yesterday, leaving a memory ·which all will cherish.

On motion of Hon. FRANCIS KERNAN, a committee was appointed to report resolutions.    The chair named as such committee Hon. FRANCIS KERNAN, Judges HUNT, BACON, DOOLITTLE, and Hon. ROSCOE CONKLING.

The committee retired for a short time, and Hon. Francis Kernan reported the following preamble and resolutions :

HIRAM DENIO, a resident of this city, a member of the Bar of Oneida county during fifty years, an esteemed friend, has, in the providence of God, been removed by death from the scene of his earthly labors.

As a member of the legal profession he deserved and acquired an enviable reputation for industry, ability, learning and unyielding integrity.

As circuit judge and vice-chancellor for the fifth circuit, he discharged his varied duties acceptably to all, and was justly characterized in the court of last resort, as " that very able judge and upright vice-chancellor."

As a judge of the Court of Appeals, during twelve years, he discharged the responsible duties of that high office with conscientious diligence and labor in examining all questions which came before the court, with judicial learning and ability rarely equaled, with dispassionate fairness and impartiality which commanded the confidence of all just men, and with

a pure and incorruptible honesty of purpose which sought to declare correctly the law, and to administer justice in accordance with its enlightened precepts.

As a citizen he was patriotic; as an individual, of pure life; as a neighbor, kind and benevolent; as a friend, considerate and faithful. He was a sincere Christian, and evinced his faith by his works.

In memory of his worth and of our loss, we, his professional brethren of Oneida county, who knew him well and loved him, make this brief record, and do

*Resolve,* That we are deeply grieved by the death of Hiram Denio; taken from us ripe in years and full of honors, we feel that we have lost a judicious counselor and guide, and a friend whom we revered.

*Resolved,* That we recall with pride and pleasure, and will hold in memory, his many virtues and unblemished life, his marked exemplifications, as a member of our profession, of that industry, honesty and fidelity to duty which must characterize him who would worthily aid in the administration of justice, and the noble illustration he has given, on the bench, of the qualities which make the great and upright judge.

*Resolved,* That we sincerely sympathize with the family of the deceased in their great bereavement and sorrow, and offer them our condolence.

*Resolved,* That a copy of these proceedings be presented to the family of the deceased.

*Resolved,* That a committee of three be appointed to present these proceedings to the Court of Appeals, and to request that they be entered upon their minutes.

*Resolved,* That the members of the Bar will, in a body, attend the funeral of the late Judge Denio, as a mark of their regard and respect for the illustrious deceased.

Judge Hunt, after brief introductory words, spoke as follows :

My relations with Judge Denio have been such, that I cannot permit this occasion to pass in silence. I was a student in his office, and always received from him and his excellent partner, who now survives him, every mark of kindness and attention. Upon his resignation of the office of Circuit Judge, I became his partner in business. When he retired from the office of Judge of the Court of Appeals, I succeeded to his office. Few men could fill his place.

His career affords an example to all young men. With no aid of friends or family, with no advantage of money, without the

benefit of a liberal education, his career was an entire success. He was laborious in duties, and attentive, spending his days not only, but his evenings in his studies.

He held many offices of public trust, and many positions of private confidence. He was always equal to the occasion. It was felt that there was a reserved power unused. He was not strained or embarrassed in the performance of his duties. He did them well, fully, and always left the impression that there was uncalled for and unused, a much greater ability.

He held the office of district attorney of this county for nine years, and with the possible exception of Timothy Jenkins, it is no disparagement of others to say that his like has not since been found. In every criminal case he was thoroughly prepared, both on the law and the facts. His indictments were accurately drawn, and always stood the test of criticism. He tried his cases with zeal and vigor. Indeed it was sometimes said that he sought convictions with too much earnestness. But he never asked a conviction unless satisfied of the prisoner's guilt. Being so satisfied, he seldom failed to impress his conviction upon the jury. Culprits complained, but the public were content.

The fame, however, of our departed brother will rest upon his judicial character. There are those now present who recollect him as presiding at the circuits, clear, calm, courteous and decided. He was the model of a circuit judge. While no proper argument was shortened, no time was lost in tedious harangues. He required trials to be completed without the loss of a moment unnecessarily; but he never sacrificed justice to haste. All things were done in order and deliberately.

As a judge of an appellate court he was rivaled by few, surpassed by none. His written opinions compare favorably with those of Marshall or Taney, Mansfield or Eldon. In careful examination, or extensive knowledge, in the sound application of acknowledged principles, in the accurate use of chaste and classic language, he was unsurpassed by either of these distinguished men.

He was nearly the last of his race. Kirkland and Wetmore, a few years his seniors, and Foster, a few years his junior, alone

survive him. That innumerable caravan of great lawyers and great judges, which this county has produced, has marched to to the silent chambers of death. Platt, Gold, Sill, Talcott, Kirkland, Maynard, Bronson, Beardsley, Spencer, Clark, Mann and Jenkins, have all preceded him. There were giants in those days, and our departed friend was not the least among them.

Professional fame is transient; judicial reputation is limited. The warrior and the statesman receive public honor, while the jurist and the judge may be unknown. But the victories of peace are not less valuable than those of war. A great conquerer in this realm has gone, full of years and honors. He leaves the legacy of a well-spent life, an untarnished reputation.

Hon. Wm. J. Bacon, said:

I cannot willingly consent to let this occasion pass in silence, and yet I am one of those who feel how inadequate are words to convey the feelings. To say that we respected and honored Judge Denio, would but feebly express our sentiments; to say that we have lost one of the most illustrious ornaments of the bench and Bar the State ever knew, would be but to speak simple truth; to say that we have lost a friend, a companion, a fellow laborer, is to say that we have lost one whom we shall often miss, and whom we shall sincerely mourn. Fortunately for myself, it happened to me to see the whole of Judge Denio's judicial career; to be where I could see all there was of goodness and strength in his character developed. I have seen him at the Bar, and have endeavored to follow his example, although at a distance. I sat beside him in the Court of Appeals when he was presiding judge of that tribunal. Posterity will pay high honor to his record while in the Court of Appeals. He will be remembered among those who have worn the judicial ermine with honor and renown. Among those who opposed him in opinion he made his name a name honored. He was exposed to severe animadversions when called to pronounce certain judgments, as for instance in the case of the police commissioners of New York; his opinion was in opposition to the hopes of his political party, and of many personal friends, and yet having satisfied himself of

the truth, he declared it. When once he planted his foot on a principle, or elaborated a doctrine, it was done with such firmness that few dare oppose him. His was eminently a judicial mind. I recognize also in Judge Denio a patriot of the highest type. I can never forget the ringing words he addressed to the first public meeting held in this city after the fall of Fort Sumter. He sounded the clarion note which called us all to the platform of duty. He preserved that patriotism to the end. He lived beyond the ordinary measure of active lives like his, and rounded off his duties beautifully and well. He retired gracefully from the bench, and had closed up the business of his active life before his first summons came.

Hon. C. H. Doolittle, said:

We had scarcely returned from paying the last offices to the esteemed relative and lifelong friend of Judge Denio, who so recently passed away in the fullness of years, as serenely and beautifully as she had lived, when the announcement was made that he had departed this life, and passed to that other world to which the Christian's faith and the Christian's hope had directed his thoughts. His death was not unexpected. The solemn warning to be ready, which he received three years ago, in the afflicting dispensation of Providence which prostrated him, indicated his earthly career was drawing to a close. From that hour his constitution steadily and perceptibly failed. When, having passed the limits of three score years and ten, at the ripe age of seventy-two years the summons came. In his last years he enjoyed all the comforts wealth could furnish, and, far beyond that, he was blessed with the society and the tender and ever watchful care of kind and loving friends whose regard for his happiness knew no bounds. He saw the day of his departure approach without fear, but with a faith anchored in the promises of God, he rather hailed the transition for which his life had prepared him, and departed without a struggle.

We have convened to-day to pay the last duty and affectionate regard for our late associate and distinguished fellow-citizen; to give expression to the deep sense we entertain of those qual-

ities which secured our respect and esteem, and gave him the high character he enjoyed in the nation. We have seen him in the discharge of the duties of attorney and counsel at this Bar; we have seen him in the discharge of his various official duties; we have seen him in all the relations of life, and we can bear witness to the purity and uprightness of his character.

He left Fairfield academy to commence the study of the law, and without fortune or position he devoted himself with entire singleness of purpose to the acquisition of his profession. From that period to his death he brought to the performance of every undertaking, and to the discharge of every duty, a clear and vigorous mind, a sound judgment, and untiring industry and perseverance. His distinguishing characteristic was that he laboriously and faithfully devoted himself to the discharge of every duty that devolved upon him, and to the performance of every obligation he assumed, with a conscientious determination to discharge his whole duty. When he was a student, he was trustworthy, diligent and efficient. When he accepted a retainer, while at the Bar, whether as attorney or counsel, he scrupulously and laboriously performed the service it implied. He never trusted to any temporary inspiration. He was quick to see the points in a case, was well grounded in legal principles, and was familiar with the adjudications of the courts, but he always prepared himself for each trial and argument methodically and elaborately. His addresses and arguments were clear, logical and forcible, but without ornamentation. They were the result of a close and careful examination of his cases. There was no parade or ostentation about him.

The simplicity of his manner, his habitual candor and laborious research, commended him to the attentive consideration of those he addressed. Never, either in the heat of professional controversy or in the excitement of partisan warfare, was any one ever known to question his integrity. His integrity, his candor and laborious research, gave him great influence and power. No one who knew him met him in the trial of an action in which any disputed question of law arose, but feared him.

Judge DENIO adorned various official positions, but he never

sought office.   His fidelity to his engagements, the simplicity of his manners, and his integrity, as well as the clearness and strength of his intellect, inspired confidence, and commended him to those who had offices to bestow.   They knew that whatever duty he accepted would be discharged creditably and efficiently.   While others struggled to obtain office, office sought him.   The record he has left, in the discharge of each official position he has held, shows a conscientious and faithful discharge of the duties it imposed, and is alike creditable to his efficiency, his integrity and ability.

He was more widely known, and became more conspicuous as judge of the Court of Appeals than in any other position.   His fame as a jurist may well rest upon his judgments during the twelve years and upward he occupied that position.   They have passed into precedents.   They have been, and they will continue to be cited, as sound expositions of the law, in every court in this land.   He belonged to a distinct political party, and had partisan views and political associations, but no trace of them ever appeared in his judgments, nor were they ever permitted to modify his patriotism.   When questions came before him which involved political party considerations, more than ever, if possible, he was careful to declare as it was, and administer, justice without alloy.

When danger menaced the nation, his party predilections were merged in his love for his country, and he was at all times ready and anxious to coöperate with those who fought for its preservation, without qualification.

The extent of his researches, and the vastness of his attainments, and the clearness and force with which he presented his views, gained him the confidence, and gave him great influence with his associate judges.   He was an invaluable man in that court, and will be so regarded by all those who do or shall occupy seats on that bench, as long as the court shall exist.   His opinions are clear, compact and forcible.   They evidence extensive attainments, great research, and a clear perception of the principles involved, and are characterized alike by deep thought and sound practical judgment.   They are and will ever be considered models in that department of the law.

Go where you may, in any part of this broad land, and you will find intelligent men who never saw HIRAM DENIO, but who speak of him as an old acquaintance, and with admiration. Intelligent men everywhere know and appreciate his judicial character. His fame belongs to the profession of the whole country of which he was so conspicuous a member. The highest eulogium upon the manner in which he discharged his duties in the various positions he occupied, is the universal respect and confidence it inspired.

His mind was ever active. He was accustomed to read much outside of his profession. In the interests of professional labors he was a constant reader of works on subjects that interested him, and of general literature. About ten years ago he learned the French language, to enable him to peruse such French works as he desired to read, and he read them with facility. His general information, outside of his profession, was extensive and varied. In his conversation he was ready and easy, agreeable and interesting. In his relations with all classes of his profession he was kind, considerate and obliging. The beautiful portrait of him which has so long adorned this court-room, is the result of the admiration and respect with which his character inspired this Bar.

With Judge DENIO we have lost almost the last of that distinguished coterie of lawyers who were conspicuous and shining lights in the profession throughout the State, and so long active leading members of this Bar, and belonged to the generation that has preceded us. Beardsley, Bronson, Spencer, Gridley, Jenkins, DENIO, they have all been gathered to their fathers, but they have left to the profession an invaluable legacy, " a professional example which death hath not touched, and which time cannot obscure,"

Hon. FRANCIS KERNAN was the next speaker. We give an abstract of his remarks :

I wish to unite earnestly in all sentiments of respect and commendation that have been uttered in regard to Judge DENIO. He has left to the profession an example to which its members

cannot too closely conform. I know no man who, when employed in his professional capacity, brought to the discharge of his duties a more conscientious sense of his responsibilities. As a judge, he left a character which may well serve as a model for any. He always seemed eminently judicial in all his characteristics. In his patience in hearing a case; in the closeness of his examination; in the caution with which he came to a conclusion; in the respectful consideration with which he listened to the dissenting views of his associates, and in his stern adherence to the law, no man excelled him. In the discharge of duty he knew no friend, no foe, no outside consideration of any kind. He was unselfish, and always ready to advise with his younger friends. As a model in the profession, as a model in the community, as a standard by which to test the great and good, we may scarcely hope to meet his equal. His loss leaves a void in the community, a void in the profession, and will be severely felt by friends and relatives. Even at such a time the memory of his character in a measure consoles us all for the loss we have sustained.

Judge MASON, said :

Although suffering from the effects of ill health, I cannot let this opportunity pass without a word expressive of the high regard in which I held Judge DENIO. I entertained high respect for him from the first time that I met him in the court of last resort. I need not say how soon that respect grew to a warmer feeling. Did I feel doubtful as to any case, I could securely rely on his judgment. We of the Bar owe to him a large debt of gratitude. Our libraries will daily remind us of this. His were the elements of character that go to make a great judge. Careful as to the expression of opinion until he had patiently investigated, he was immovable in his conclusions. He was eminently a just judge, and constant seeker after truth. His very broad and vigorous mind was controlled by equally broad common sense. He had a wonderful power of discrimination in the application of principles of the law. I earnestly join in the sentiments expressed by the Bar to-night.

John F. Seymour, Esq., said :

I can add nothing, Mr. Chairman, to the just eulogiums which have been paid to the integrity and learning of Judge Denio, by which he won such merited distinction as a lawyer and judge. But there is another phase of his history, equally worthy of eulogium. From the year 1836 to the close of his life, a period of over thirty-five years, he devoted a large portion of his valuable time, without any remuneration whatever, to the protection of the earnings of the poor, deposited in the Savings Bank of Utica. The fidelity, firmness and care which he displayed in his distinguished career as a jurist, he applied with untiring and disinterested zeal to the protection of these earnings. This gift of his valuable time, and services, during so many years, was the greatest possible of all beneficence. In view of the importance of his services, and of the magnitude of the earnings thus wisely protected by him, and the thousands of homes and hopes depending upon them, I do not hesitate to say that there is no man to whom the poor and laboring classes of this city and county are more indebted than to Hiram Denio.

The resolutions were unanimously adopted.

On the 22d of November, 1871, a meeting of the Bar of the State was held at Albany, in the Court of Appeals room, in the capitol, to give expression to their feelings on the same occasion. There was a large attendance of members of the Bar. Chief Justice Church presided.

Messrs. Henry R. Mygatt, of Oxford, William S. Cogswell, of Rochester, and W. R. Prentice, of New York, were selected as secretaries. Messrs. J. H. Reynolds, of Albany, Francis Kernan, of Utica, W. A. Beach, of New York city, Lyman Tremain, of Albany, were appointed a committee on resolutions.

Hon. Amasa J. Parker, addressed the meeting as follows :
The melancholy duty has been assigned to me, of announcing the death of Hiram Denio, and asking that the customary trib-

ute of respect shall be paid to his memory. To no one who has preceded him has that tribute been more justly due.

Judge DENIO died at his residence at Utica, on Sunday, the 5th inst., in the 73d year of his age. Surrounded by friends who loved him, and in a community where he was held in the highest respect, he sank peacefully to his rest, full of years, crowned with the honors of this world, and looking forward in the full confidence of Christian faith to that brighter crown awaiting him in a blissful immortality.

The career of Judge DENIO, at the Bar and on the bench, has been marked and full of interest. In a county distinguished for the ability of its Bar, he rose to eminence among such men as Storrs and Bronson, and Beardsley. Living in a community where true merit was appreciated, the modesty of his demeanor and his unassuming manners, were aids rather than obstacles in the way of his advancement. ·

In 1834, he was appointed circuit judge and vice-chancellor of the fifth judicial district, and then began the judicial career in which he became so distinguished. But his health failing, after about four years of service, he was compelled to resign, and returned to the practice of his profession. He held, also, for a time, the office of bank commissioner, and other places of public trust, better adapted to the state of his health, in all of which his duties were discharged with scrupulous fidelity.

The five volumes of his reports, of decisions made by the court for the correction of errors, and the Supreme Court, are models of accuracy and brevity of statement. No reporter has been more successful in extracting from the cases and opinions, and presenting in the syllabus, in concise and clear language, the real questions decided by the court.

But Judge DENIO was destined to a higher and a still more distinguished career. In June, 1853, he was appointed by the Governor, to fill a vacancy upon the bench of the Court of Appeals, and was twice reëlected to that position.

It was during his thirteen years of service in that court, that Judge DENIO earned his very great reputation as a judge—a reputation acknowledged in Westminster · Hall as well as in all the

courts in the Union—a reputation that will prove as enduring as the annals of our jurisprudence. Having had the opportunity of viewing him from different standpoints—as well while, for a single year, associated with him in that court, as at a later period practising before him at the Bar—I may be permitted to speak more particularly of his qualifications ; and I think those I address, who have shared with me these advantages of observation, will agree in all that I shall say of him.

His mind was peculiarly adapted to the discharge of the duties of the judicial office. It was clear, comprehensive and discriminating, and singularly free from prejudice or bias. He had trained it to close attention, and to the mastery of details. In seeking out and selecting for consideration, the true questions involved, he looked at the whole case with conscientious and characteristic fidelity. Though tenacious of his opinions, when deliberately formed, he never failed to treat with respect the opinions of those who differed from him. He felt deeply the great responsibility of making a decision from which there could be no appeal.

His diligence is best shown by allusion to the fact which those who have been with him in consultation, after a vacation, will well recollect, that while he never failed to present written opinions in the cases assigned to him, he had also notes, which he had made on examination after the argument, to aid him when the final vote should be taken.

As a lawyer, Judge Denio ranked among the most learned our State has produced. By the aid of a good memory, impelled as well by a love of legal science as by considerations of duty, he became a most thorough and accomplished jurist.

It is no disparagement to those who have been from time to time associated with him upon the bench, to say that I have often heard it said by counsel (and I shared fully in the sentiment they expressed) that they would willingly argue their case before him alone, sitting as a court of last resort. I speak, I am sure, the opinion of the Bar, when I say that no judge ever sat on the bench in this State or elsewhere, in whose learning, ability and purity, the public or the profession felt more confidence. His-

tory, which rarely fails to do justice to those who have passed away, will inscribe his name on the same page with Kent and Spencer, and Bronson. Like them, he will be justly spoken of by those who follow him, as a great lawyer and a great judge.

There was an incident in his judicial life which ought not to pass unnoticed. During his first term of office in the Court of Appeals, a constitutional question came before that court for decision, in which the judgment which he gave was in conflict with the public sentiment, and was generally considered by the members of the political organization which had nominated him, as a departure from those strict rules of construction in which he had been educated.

It was near the close of his term, and popular clamor loudly demanded that he should not be renominated. It was an occasion to test the wisdom of our elective system. When the nominating convention assembled, an eminent citizen of our State, feeling the imminent danger that great injustice would be done to an able and upright judge, presented himself before that body, and in truthful and eloquent words, discussed the question before it, and the considerations that ought to influence its action.

He pointed to the independence of the act complained of, the unquestionable purity of motive, the learning and known integrity of the man, the wicked injustice of condemning a judge for acting conscientiously and boldly, and the impolicy of such a condemnation with reference to future action of the judiciary. The appeal was successful, and he carried with him the convention, in opposition to its own preconceived intentions. Judge DENIO was unanimously renominated, and triumphantly elected. The result has done more to strengthen confidence in the wisdom of our elective judicial system than any other event which has occurred since its adoption.

At the close of Judge DENIO's second term, in 1856, to the universal regret of the profession, he declined a reëlection, though urged to continue on the bench by the leading men of both the great political parties of the State. Perhaps he was wise in retiring while in the full exercise of his intellectual powers. He felt that he had attained nearly to the allotted age of man, and he

may have foreseen, not far distant, the impending blow which, as events proved, was soon to prostrate him, and afterwards to sever the ties which bound him to the earth. Who can say that " coming events " do not, as to each of us, often " cast their shadows before ?"

Thus far, I have alluded to the qualities of Judge DENIO, which characterized him as a judge. But I ought not to omit to speak of him as a man; for it is in the latter capacity that he holds the most intimate relations with the world, and by which his true personal character, for time and for eternity, is to be judged. And here, I am sure, he was a model worthy of imitation.

Without raising the veil to look at the endearing relations of that inner circle of domestic life to which he was bound so closely, who of all his friends (and he had no enemies) did not love him for the childlike simplicity of his nature, the unselfish spirit which actuated him, the courtesy of his manner, and the truthfulness and sincerity which governed every action of his life ? The purity of his personal example, his faithful observance of the laws of God and man, and the unostentatious earnestness of his faith, secured for him the esteem and respect of all around him. By them, his memory will be cherished while memory lasts.

So much I have deemed due to the character and virtues of our deceased friend and associate.

He has left us, but we ought not to mourn his departure. His life has been a blessing to mankind. He has accomplished an enviable destiny. He has but anticipated, by a little time, the inevitable hour that awaits us all.

" Nascentes morimur, finesque ab origine pendet."

And happy will be he, who, like our departed friend, closing his eyes on the things of this world, can reopen them with Christian faith, upon the clear blue sky of eternity.

At the conclusion of Judge Parker's address, Hon. John H. Reynolds offered the following resolutions on behalf of the Bar of the State :

*Resolved,* That the members of the Bar of the State of New York received the intelligence of the death of HIRAM DENIO with feelings of profound sadness and sorrow. By his long and honorable service at the Bar and upon the bench, distinguished by uniform courtesy and kindness of demeanor, as well as by eminent ability and profound learning, he endeared himself to all his professional brethren, and now, at the close of his earthly career, they find a melancholy pleasure in giving to his memory this public expression of their respect and regard.

*Resolved,* That in the death of Judge DENIO, the State has been bereaved of a citizen whose daily life illustrated all the virtues of a Christian character, and of a man who never sought to evade any public or private duty; of mild and unassuming manners, he was firm and unfaltering in noble purposes. In his profession he was among the purest and the ablest of his associates. And upon the bench his sterling integrity gave additional dignity to the court, while his preëminent talents and unrivaled learning, shed new lustre upon the already brilliant pages of our law.

We may be glad that he lived so long, and feel regret that his career is ended, but we point with pride at the record of a life well spent in the labors of a profession to which he has left the priceless legacy of a spotless name, and the example of all that may be achieved by patient industry and persistent labor.

*Resolved,* That the chairman of this meeting transmit a copy of these resolutions to the family of the deceased, and that he also present the record of these proceedings to the Court of Appeals, now in session, with a request that they be entered upon the minutes of the court.

Subsequently the above proceedings and resolutions of the meeting at the capital were presented to the Court of Appeals, then in session, with a request that they be entered upon the minutes.

Judge BACON also presented the above resolutions of the Bar meeting at Utica, and asked that they be adopted, and entered upon the minutes of the court; prefacing the motion with a brief address, eulogistic of the deceased, and stating that those resolutions fully embodied the sentiments of the Oneida county Bar, .embracing the intimate friends and neighbors of the lamented dead.

Chief Justice CHURCH said :

On behalf of the court, I desire to say that we fully sympathize with, and approve of all the sentiments contained in the resolutions and addresses which have been presented upon this occasion, and to express our heartfelt sorrow at the loss of one who for so long a period adorned the bench of this State.

For eminent ability, profound legal learning, and incorruptible integrity, Judge DENIO is justly entitled to a position in the very front rank of the distinguished jurists which this State and country have produced.

Some of the members of the court have been associated with him upon the bench, and they bear testimony to his uniform kindness and courtesy to his associates, and to the untiring industry and great ability with which he discharged his judicial duties.

In his private life, as well as in his professional and judicial career, he has left a brilliant example, which all of us may well imitate and follow.

In all the relations of life, he sustained, in the highest sense, the character of an upright citizen, able judge, and Christian gentleman. And although he has passed from the cares and turmoil of this world, and we shall see his face no more, his memory will be cherished, and his influence felt, we have reason to believe, while enlightened, jurisprudence shall be recognized among the institutions of mankind.

The resolutions presented will be entered at large upon the minutes of this court, and as a further mark of respect, the court will now adjourn.

# INDEX.

## A

### ACCOUNT.

1. In order to obtain an account of the personal estate which came to the hands of an administratrix—she being dead—her personal representatives are indispensable parties. *Silsbee* v. *Smith,*                    372

2. Persons in possession of land sold under an order of the surrogate, to pay the testator's debts, are interested in having the representatives of the deceased administratrix made parties, to the end that it may be established, if possible, that debts of the testator were unpaid, at the time the order of the surrogate to sell was made.                    *ib*

*See* ACTION.
   CHATTEL MORTGAGE, 2.
   TENANTS IN COMMON, 2.
   TENANTS FOR LIFE AND IN REMAINDER.

### ACTION.

Where the title of the parties depends upon the construction to be given to a will, and the defendants are in possession, claiming that by the will they are entitled to exclusive possession, and they deny the plaintiff's right, an action for a construction of the will, for a partition and for an accounting, will lie; and this court will not require the plaintiffs to first try the question of title, in an action of ejectment. *Scott* v. *Guernsey,* 163

*See* CLOUD UPON THE TITLE.
   HIGHWAYS, 3.

### ADVERSE POSSESSION.

A grantor in a deed may hold adversely to his grantee. *Cramer* v. *Benton,* 216

### AFFIDAVITS.

*See* INJUNCTION, 2.

### AGREEMENT.

1. The plaintiff's farm, being sold on a mortgage foreclosure was bid off for $2400, by W. who agreed, orally, with the plaintiff to let him have the farm back on the payment of said sum of $2400, and the sum of $20 in addition, for expenses. The plaintiff failing to procure the money, or security, within the time limited, got an extension of time, and within the extended time, procured the defendant to take a conveyance from W. upon the terms on which W. had agreed to convey to the plaintiff; and it was then agreed, by parol, between the parties, that the plaintiff should remain in possession, and receive the rents and profits, and with them, and from other sources, refund to the defendant what he had paid, or should pay or secure to W., and that on such payment, the defendant should convey the premises to the plaintiff. *Held* that the agreement of the defendant to convey the premises, being by parol, was void by the statute of frauds, and could not be enforced in equity. *Loomis* v. *Loomis,*                    22

2. *Held, also,* that the plaintiff having, at the time of making the agreement,

no title or interest in the premises, and there being no legal consideration received from him, for the promise made by the defendant, that was another difficulty thrown in his way by the statute of frauds,    *ib*

*Held, further,* that there could be no express trust, in the case, for the reasons that the plaintiff had no estate to put in trust, and because there was no writing to make a valid trust. Nor could there have been a resulting trust, according to the provisions of the statute, (1 *R. S.* 723, §§ 51, 54,) no valuable consideration having been paid by the plaintiff, and the conveyance being absolute upon its face.    *ib*

4. That the conveyance being in the form which the parties agreed upon, it could not have been a mortgage, and in this particular there was no fraud. Neither had the plaintiff, in law, any estate to mortgage.    *ib*

5. A contract by which one person agrees to make, for others, three or four models of a mower, *at once and without delay,* means that the work shall be done as soon as it can reasonably be performed by the contractor. *Sharpe* v. *Johnson,*    144

6. The legal nature and character of such a contract is not for the sale and delivery of the models by the contractor, but for work, labor and and materials to be done and furnished by him for the employers. *ib*

7. If no price is agreed upon, for the models, the law fixes the price at which the articles, when made and delivered, shall be reasonably worth; if delivered in time.    *ib*

8. Where the contract is entire, for the making of "three or four" models, this leaves it optional with the contractor whether he will make three, or four. In the absence of any orders on the subject, it will be deemed to have been left to him to decide on the number.    *ib*

9. Therefore, by making three, he will be held to have completed the contract, as to the amount of work and labor, and materials, to be done and furnished.    *ib*

10. Where the referee, in such a case, found that the first model was completed without unreasonable delay, but that the two others were not made at once, according to the contract, nor until after an unreasonable time had elapsed; *Held* that it did not follow from this that the contractor was entitled to recover the value of the first model, but not that of the other two.    *ib*

11. That the contractor was entitled to recover the whole or nothing; the contract being entire, and in no respect divisible, either as to number, time, price or day of payment. *ib*

12. That the contract was not performed by the contractor, so as to entitle him to recover anything, until all three were made and delivered, or in readiness for delivery.    *ib*

13. And that the acceptance of one model, which was made in time, created no liability whatever, on the part of the employers, unless the entire contract was afterwards performed, or the further performance waived by them, before the time for complete performance had expired.    *ib*

14. Before a party can recover upon a contract, he must show that he has performed on his part. If, in his complaint, he counts simply, for work and labor, the other party may defeat the action by setting up as a defense, and proving, that the work and labor was done in pursuance of a contract between the parties, which has not been performed by the plaintiff.    *ib*

15. The plaintiff received a lamb, as a gift, from her mother, who at the same time made an agreement with H. to keep the same for the plaintiff, upon the terms of giving the latter all the increase, and H. to have all the wool, for the keeping. The increase amounted, in six years, to some seventeen sheep, which were levied upon by the defendant, as the property of H. *Held* that H. had no title to the sheep, but was merely a bailee thereof. That he had no title to the wool, until he had performed his entire contract by keeping the sheep until shearing time. That for the entire performance of the con-

tract, on his part, he would be entitled to the consideration promised, to wit, the wool; but that a part performance, only, gave no title; and the defendant took, by his levy, no other or better title than H. had. *Held, also,* that the title to the sheep was in the plaintiff. *Hasbrouck* v. *Bouton,* 413

16. Upon a sale of hides by the plaintiffs to the defendant, through a broker, the bought and sold note was as follows: "New York, Feb. 19, 1859. Sold for account of D. G. and W. B. Bacon, to Mr. W. W. Gilman, 4045 Singapore and Penang Cow Hides, per Samuel Appleton. No allowance except for sea damaged. Price 12 cents per pound, cash." *Held,* that the contract was for the purchase of all the hides, at the price of 12 cents per pound, subject to a deduction from the price, at the usual and fair rate, for any of the hides that were sea damaged. *Bacon* v. *Gilman,* 640

17. And that the title to the whole passed to the purchasers; and the right of the vendors, to sue for the price, followed immediately upon the delivery of the goods. *ib*

*See* FORECLOSURE SUIT, 2.
FRAUD.
TENANTS IN COMMON, 1, 2.
VENDOR AND PURCHASER, 4, 6.

## ALIMONY.

*See* DIVORCE, 2.

## ANIMALS.

There is not known in practice, and cannot be in law, such a union of interest or title, or partnership, in animals, as that one party shall own the carcass, and the other the wool, the hair, or the feathers. *Per* POTTER, J. *Hasbrouck* v. *Bouton,* 413

*See* CONSTITUTIONAL LAW, 5, 6, 7, 8, 9.

## ANSWER.

1. A general denial, now, like the general issue under the former practice, puts in issue the existence, at any time, of the cause of action alleged in the complaint, and admits of evidence tending to establish such defense. *Evans* v. *Williams,* 346

2. If a cause of action has once accrued or existed, and has been satisfied, or defeated, by reason of something which has accrued subsequently, that is new matter, which must be pleaded, in order to render it competent as evidence. *ib*

3. Where, in an action upon a promissory note, tried in a justice's court, the defendant, under an answer of denial and payment, offered to prove that the debt on which the note was founded had been paid to the creditor, before the making of the note in suit; *Held* that under the rule for the liberal interpretation of pleadings in justices' courts, the answer was sufficient to authorize the admission of the evidence offered, even if an answer setting up new matter were necessary. *ib*

*See* EQUITY, 1, 2.
GENERAL ISSUE.

## APPEAL.

1. An appeal does not lie from a judgment entered upon an award of arbitrators, solely on a case containing the testimony taken before the arbitrators, and a copy of the judgment roll. *Dibble* v. *Camp,* 150

2. If a party feels aggrieved by the award, his only remedy is to move the court at special term, either for an order modifying the award, or for an order vacating it; and upon the grounds, and in the manner provided by the Revised Statutes. (2 *R. S.* 542, §§ 10, 11.) *ib*

*See* COMMON SCHOOLS.
CONSTITUTIONAL LAW. 3.
COURT OF APPEALS.
CRIMINAL LAW, 5.

## APPRAISAL OF DAMAGES.

*See* CONSTITUTIONAL LAW, 1, 2.

## ARBITRATION AND AWARD.

*See* APPEAL.

## ARREST.

*See* JUDGMENT, 6 to 11.
MENACES.
PROMISSORY NOTES, 1.

## ASSAULT AND BATTERY.

1. While it is well settled that in an action for assault and battery, evidence of acts done or words spoken by the plaintiff long before the cause of action arose, is inadmissible for the purpose of showing provocation and mitigating the damages, yet when such acts or words are a portion of a series of provocations frequently repeated, and continued down to the time of the assault, they may be proved. *Stetlar* v. *Nellis*, 524

2. Accordingly *held* that evidence of the speaking and uttering, by the plaintiff, at various times before the assault complained of, of the same slanderous and insulting words in reference to the defendant, and within his hearing, which were alleged to have been spoken at the time the assault was committed, was admissible. *ib*

## ASSESSMENTS.

1. Although the omission to advertise for bids or sealed proposals for cross-walks to be laid or relaid, when such cross-walks are embraced in the resolution of the common council for paving an avenue, is a legal irregularity, under the act of 1858, (*Laws of* 1858, *ch.* 338,) yet under the provisions of section 27 of the act of 1870, chapter 383, it is not necessarily fatal to the assessment; as the assessment may be modified, by deducting therefrom the amount of the unlawful increase. *Matter of McCormack,* 128

2. The objection that, in paving an avenue, the space between the rails of a railroad company was not paved, relates to an omission of which property owners cannot complain; since by such omission their burden is lessened. It is not a legal irregularity, within the meaning or spirit of the act of 1858, and fatal to the assessment. *ib*

3. The objection, to an assessment, that the kind of pavement selected by the common council was patented, and therefore not open to competition, is equally unavailable. *ib*

4. A charge for collection, if it exceeds the two and a half per cent allowed by law, is erroneous, but not fatal to the assessment. The excess may be deducted, under the act of 1870. *ib*

5. The acts of the assessors, while in the lawful discharge of their duty, cannot be reviewed by proceedings under the act of 1858, although the assessors were governed, in their deliberations, by an erroneous *principle.* *ib*

6. Such an error will not constitute a legal irregularity, within the meaning of that act. *ib*

7. It was the intention of the legislature, by the act of 1813, (*Valentine's Laws, p.* 1252, § 178,) to make the confirmation of the report of commissioners of estimate and assessment when lands are taken for a park, &c., as they have declared it to be, final and conclusive in reference to their proceedings, as between the commonalty of New York, and all persons whomsoever, in reference to the land taken, and the estimate and assessment made and imposed. *Matter of the Commissioners of the Central Park,* 132

8. All persons are thus advised that, being given the opportunity to be heard, they must appear, and by objection either made before the commissioners or submitted to the Supreme Court, protect whatever rights are invaded or jeopardized. *ib*

9. The object of notice of publication would be defeated if the abstract of the awards of the commissioners could not be altered; and although an award is made to a particular individual, in the first instance, he will not be justified in relying upon the entry of such award, and the abstract of the report. It is his duty to see, if he means to rely upon the report as originally prepared, that it is not, at the instance of any subsequent claimant having even an apparent title, altered to his prejudice. *ib*

10. The alteration or correction may be made, according to the statute, at any time before the report is presented to the court, after publication. *ib*

11. Although the report of the commissioners, when confirmed, is final and conclusive, in regard to the estimates and awards, it is not conclusive upon the rights of claimants *inter sese.* The statute allows an action to be brought against the person to whom the award is made, after payment thereof to him, by the person to whom of right the money paid belongs, notwithstanding the report. *ib*

12. Hence, an application by such rightful owner to set aside the order confirming the report will be denied, upon the grounds that the confirmation of the report is final, conclusive, and an end of the proceeding; that the commissioners are *functi officio;* and that the court has not the power to alter the report, or send it back to the commissioners, for correction. *ib*

13. Where an ordinance of the common council of the city of New York directed an avenue to be curbed and guttered, and the sidewalks to be flagged, without directing that new flagging should be used; *Held* that it was no objection to the assessment that a part of the old flagging was relaid, and the old curb reset, the expense of the labor, only, being charged. *Matter of Anderson,* 375

14. Nor is it an objection to the assessment that the lots are charged for the work done opposite each lot, while the expenses are charged on all the property, per foot, equally. *ib*

15. Although the street directly in front of a lot may not require much expense to bring it to the grade, still the lot may be very much benefited by the grading beyond it; and the assessors are to judge of the extent of such benefit. *Per* INGRAHAM, J. *ib*

16. The objection that more than one lot, owned by the same person, is included in one assessment, is not a valid ground for vacating the same; provision being made for apportioning the amount upon each lot, if necessary; although it would be better to assess each lot by itself. *ib*

17. When objections are made by a person assessed, to an assessment for a local improvement in the city of New York, and are disallowed by the assessors, it is the duty of the assessors to present such objections, with the assessment, to the board of revision, for the purpose of enabling that board to correct the errors, if any, of the assessors. *Matter of Dunning,* 377

18. And an omission by the assessors to submit such objections to the board of revision is an "irregularity" in "the proceedings relative to an assessment," within the meaning of the statute of 1858, in relation to "frauds in assessments for local improvements in the city of New York," (*Laws of* 1858, *ch.* 338, § 1,) which authorizes an application to a judge of this court, to vacate the assessment. *ib*

*See* CONSTITUTIONAL LAW, 1, 2, 3.
CORPORATIONS.
MUNICIPAL CORPORATIONS, 2, 3, 4,

## ASSIGNMENT.

*For benefit of creditors. See* VENDOR AND PURCHASER, 6.

## ASSOCIATIONS.

*See* BENEVOLENT SOCIETIES.

## ATTACHMENT.

*See* JUDGMENT, 3.

## AVENUES.

*See* ASSESSMENTS, 1, 2, 3, 13, 14.

# B

## BAIL.

*See* CRIMINAL LAW, 1, 2.

## BAILMENT.

1. The hirer of any thing is responsible for that degree of diligence which all prudent men use in keeping their own goods of the same kind. He is not only liable for his own personal default, but also for that of his servants, and persons employed by him. *Hall* v. *Warner,* 198

2. An innkeeper, or the servant of an innkeeper, is not presumed to possess any peculiar learning or skill not accessible to other persons, which authorizes the hirer of a horse to commit the proper feeding, or harnessing, of the horse to him, without responsibility for his acts or neglects. *ib*

3. Thus, where the hirer of a horse stopped at an inn, and ordered the horse to be put into the barn, and fed, and owing to the neglect of the hostler to put the bits in the horse's mouth, on bringing him up, the animal was unmanageable, and ran away, damaging himself, the buggy and harness; *Held* that the hirer of the horse was liable to the owner, for the damage occasioned by the negligence of the hostler. *ib*

*See* AGREEMENT, 15.

## BENEVOLENT SOCIETIES.

1. The consent and approbation of a justice of the Supreme Court required by the act of April 12, 1848, " for the incorporation of benevolent, charitable, &c., societies," to the certificate of organization of a society under that act, although necessary, like the acknowledgment before a commissioner, is not *conclusive* upon the Secretary of State, nor upon the court, upon the question whether the association, as its objects are stated in the certificate, is within the authority and meaning of the statute. *The People, ex rel. Blossom* v. *Nelson,* 159

2. An association formed under that act, to provide a " relief fund," and " to aid persons of moderate pecuniary resources in obtaining from a respectable insurance company insurance on their lives, and in maintaining the necessary payments on the same, and to secure to families so insured an immediate advance of funds in case of death," is not within the meaning of the statute; the object of such association being the loaning of money. *ib*

## BILL TO REDEEM.

*See* COMPLAINT, 2.

## BONA FIDE PURCHASER.

*See* VENDOR AND PURCHASER, 6, 7.

## BOOKS OF ACCOUNT.

*See* EVIDENCE, 4.

## BROOKLYN, (CITY OF.)

*See* STATUTES, 1, 2.

# C

## CASES COMMENTED ON, AND DISTINGUISHED.

1. The cases of *Bunn* v. *Vaughan,* (3 *Keyes,* 345;) *Kane* v. *Gott,* (24 *Wend.* 641,) and *Savage* v. *Burnham,* (17 *N. Y.* 561,) commented on, and distinguished. *Curtis* v. *Smith,* 9

2. The case of *Nichols* v. *Michaels,* (23 *N. Y.* 264,) although it holds that as to the *vendee,* upon whom a fraud has been committed, the sale is voidable at his option, does not sustain the position that fraud in the sale renders the sale only voidable as to the *vendor,* of whom the property was fraudulently purchased. *Joslin* v. *Cowee,* 48

3. The case of *Schaffner* v. *Reuter,* (37 *Barb.* 44,) commented on and distinguished. *Briggs* v. *Mitchell,* 288

4. *Osgood* v. *Laytin* (5 *Abb. N. S.* 1) being a decision on the statute of this State, has no application to a

creditor's suit brought to reach the assets of a foreign corporation. *Bartlett* v. *Drew*, 648

## CERTIORARI.

*See* CRIMINAL LAW, 3.

## CHARITABLE SOCIETIES.

*See* BENEVOLENT SOCIETIES.

## CHATTEL MORTGAGE.

1. Where a chattel mortgage contained a power to the mortgagee, in case of default in payment, to take possession of the property, and sell the same, and after deducting all expenses, to apply the proceeds in payment of the debt; and in case he should at any time deem himself unsafe, that he might take possession of the property and sell the same at *public* or *private* sale, before the day of payment; *Held* that on default in payment at the day, the mortgagee might sell the property at *private* sale, without notice to the mortgagor; and that if the sale was fair and *bona fide*, the right of the mortgagor to redeem was foreclosed. *Ballou* v. *Cunningham*, 425

2. *Held, also*, that under such circumstances, the mortgagee did not, by selling the property at private sale, render himself liable to account to the mortgagor for its full value; nor could the latter be allowed to prove the value of the property, for the purpose of recovering the difference between that sum and the amount realized from the sale. MULLIN, P. J. dissented. *ib*

## CLOUD UPON THE TITLE.

A party cannot maintain an action to remove a cloud from the title to land in which he has no interest, upon the sole ground that he has warranted the title. He can only be called upon, on his covenant of warranty, where there has been an eviction under valid and paramount title. *Bissell* v. *Kellogg*, 617

## COMMISSIONERS OF HIGHWAYS.

*See* HIGHWAYS, 1, 2, 3, 4, 5.

## COMMON SCHOOLS.

1. The expenses of actions commenced or defended by the trustees of a school district, without a previous resolution of the district, and for which expenses, notwithstanding the want of a previous resolution, an assessment may be made upon the district by a vote of the inhabitants at a district meeting, or on appeal from their refusal, to the county judge, under sections 9 and 10 of title 13 of the act of 1864, "to revise and consolidate the general acts relating to public instruction," do not embrace *penalties*, which are expressly excluded from the operation of section 8. *The People ex rel. Gilpatrick* v. *Hatch*, 228

2. It is only cases arising under section 8, which the county judge may review on appeal taken and heard as provided in sections 9 and 10. *ib*

3. Hence an appeal does not lie to the county judge from the refusal of a school district meeting to vote a tax to reimburse a trustee for the costs and expenses of an action brought by him, against a pupil, to recover the penalty imposed by the 3d section of said title, for disturbing the school. *ib*

## COMPLAINT.

1. The addition of the words "the commissioners of the board of excise of —— county" to the names of the plaintiffs in the title of a cause, without anything else, is in law a mere description of the persons, and indicates that the action is the private action of the plaintiffs. *Bonesteel* v. *Garlinghouse*, 338

2. In a bill to redeem, an offer to pay whatever may be found due upon the mortgage, or a tender of the amount which the plaintiff concedes to be due, are indispensable. Without one or the other of these, the complaint does not set forth a cause of action. *Silsbee* v. *Smith*, 372

*See* PHYSICIANS AND SURGEONS, 7.

## CONDITIONAL DEVISE.

See *Brundage* v. *Domestic and Foreign Missionary Society*, 204.

## CONSIDERATION.

*See* GENERAL ISSUE.

## CONSIGNOR AND CONSIGNEE.

1. Where an express company has carried a box marked " C. O. D.," and the sum charged thereon has been paid by the consignee, and the package, on being opened, proves to be worthless, and " a swindle," on the part of the consignors; and the agent of the express company, on the discovery of the fraud, returns the money to the consignee, he cannot recover it back, even upon the promise of the consignee to " make it right." *Herrick* v; *Gallagher*, 566

2. In such a case, the express company, and its agent, are the agents of the consignors for the purpose of transporting and delivering the package to the consignee, and collecting the money of him. And if, by reason of the fraud of the consignors, the consignee becomes entitled to recall the payment he has made to the agent, for the use of his principals, he may recall it, upon notice to such agent; provided the latter has not paid the money over to his principals, and also provided no change has taken place in the situation of the agent since the payment to him and before such notice. *ib*

3. The rule laid down in all the cases is, that in order to protect the agent, he must have paid over the money to his principal, or in some way have changed his situation *since* the payment of the money to himself, upon the faith of such payment. *Per* TALCOTT, J. *ib*

4. If the transaction, on the part of the consignors, is a bald and naked piece of swindling, the law will lend no aid in the collection of moneys for the satisfaction of such a claim. *ib*

5. It is clearly the duty of the agent of the express company to pay back the money on the discovery of the fraud, and notice thereof, if the money is then in his hands. He can then no longer retain it, even for the purpose of paying it over to those who have used him as their innocent tool, to carry out their unlawful scheme. *ib*

6. The consignee having regained possession of the money which he has so paid, is under no obligation, legal or moral, to restore it to the agent of the express company; neither is such agent liable to the consignors, or the express company. *ib*

## CONSTITUTIONAL LAW.

1. The constitution of this State having provided that when private property shall be taken for any public use, the compensation therefor, when not made by the State, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, (*Const. art.* 1, § 7,) the provision in the charter of the Rochester Water Works Company, (*Laws of* 1852, *ch.* 356, §§ 8–11,) which authorizes the *Supreme Court* to increase or reduce the amount of damages reported by commissioners, for the taking of land for the use of said company, is *unconstitutional* and void. *The Rochester Water Works Company* v. *Wood.* 137

2. The legislature is entrusted with the discretion to provide for appraisement by a jury, or by three commissioners, and it can provide for no other mode of assessment. *ib*

3. It was competent to provide for an appeal to the court, in order to protect the parties against an unjust appraisal; and upon that appeal, the court can confirm or set aside the assessment, and correct irregularities committed, by the commissioners or parties, in the course of the proceedings. This is the extent of the power possessed by the court. *ib*

4. Where it was manifest that the damages allowed were very large, in view of the quantity of land taken, and of the use to which it was to be put, it was *held* that the court, at special term, should have set aside

the appraisal, and appointed new commissioners. And that this court, at general term, had the power, and it was its duty, to make such an order as the special term should have made. *ib*

5. The act of the legislature, of May 9, 1867, (*chap.* 814,) amending the act of April 23, 1862, " to prevent animals from running at large in the public highways," provides for a judicial proceeding, in which· the justice has jurisdiction of the parties and of the subject matter, and therefore, so far as it authorizes the seizure of animals trespassing on a private inclosure, .is not liable to the objection that it is penal in its character, and deprives the owner of his property without due process of law; but is valid and constitutional. *Squares* v. *Campbell,* 391

6. The act is not unconstitutional because it interferes with the right of trial by jury. Due process of law does not necessarily import a trial by jury. *ib*

7. As to the damages to be recovered, the act is indisputably remedial in its character, and comes under the same principles and practice, and is sustained by the same reason, as the proceeding to distrain animals damage feasant. *ib*

8. The words " without due process of law," as used in the constitution, do not mean the want of process by which the property is taken, but the want of a judicial proceeding in which it is taken. The act in question provides for a judicial proceeding, and the captor seizes and retains the property as a part ,of the proceeding. *ib*

9. The act of 1867 gives to the owner of the property seized, by virtue of its provisions, the same right of replevin as the law gave in case of distress of animals damage feasant. *ib*

See JUDGMENT, 5.

## CONTINUING SUIT.

See PRACTICE, 6, 7.

## CORPORATIONS.

1. When trustees of a manufacturing corporation, under the act of the legislature, of April 16, 1852, " to facilitate the dissolution of manufacturing corporations in the county of Herkimer," &c., (*Laws of* 1852, *ch.* 361,) or the act of April 12, 1853, making the former act applicable to similar corporations in Cayuga county., (*Laws of* 1853, *ch.* 179,) shall have proceeded to declare the company insolvent, .and to make an assessment upon the stockholders as for a deficiency, objections to the mode in which the trustees have made the assessment, and to the considerations which they took into view and upon which they acted in determining the amount necessary to be assessed, being questions as to whether or not they erred in their determination as to the proper amount of the assessment, cannot arise in an action by the trustees to recover the amount of an assessment. *Hurd* v. *Tallman,* 272

2. If the assessors had jurisdiction to proceed and make the assessment, errors committed by them in neglecting to assess on some stock, in assessing stock not liable to assessment, and in determining the amount of the assessment, should be corrected by an application to the court, under the statute, which provides that the trustees shall be under the direction and control of the Supreme Court, on their own application or that of any creditor. *ib*

3. Stockholders claiming to have been unjustly assessed, although not expressly named as applicants in whose behalf the trustees may be directed or controlled by the Supreme Court, are probably embraced within the equity of this provision, as the general intention of the act seems to be to convert the trustees into *quasi* receivers in equity, and to subject them to the general control and direction of the Supreme Court. *Per* TALCOTT, J. *ib*

4. Where the trustees of a corporation have attempted to make an assessment upon the stockholders without having first disposed, or attempted to dispose, of the property of the company, or to collect its debts, this

is an objection which goes to the jurisdiction of the trustees to make the assessment at all. *ib*

5. Where the trustees are acting without any direction of the court, but merely under the powers expressly conferred by the act, they must defer any assessment upon stockholders till such time as they have complied with the provisions of the act in regard to disposing of the property and collecting the liabilities, that it may be seen whether any, and if any, what assessment is "necessary." *ib*

6. The liability of stockholders, to the company, for unpaid shares of stock, is a part of the fund applicable to the payment of the creditors, and should be collected by the trustees. *ib*

## COSTS.

*See* USURY, 7.

## COUNTER-CLAIM.

*See* EQUITY, 1, 2, 3.

## COUNTY JUDGE.

*See* COMMON SCHOOLS, 1, 2, 3.

## COURT OF APPEALS.

The circumstance that an appeal has been taken from a decision of the Court of Appeals to the Supreme Court of the United States, cannot absolve this court from following the decision. By this court the decision of the tribunal of last resort of the State must be considered the law of the land, until it shall have been reversed. *The Rochester and Genesee Valley Railroad* v. *The Clarke National Bank,* 234

## CREDITORS.

1. There is no propriety in allowing one creditor to make a motion for a receiver and, by stipulation with the attorney for the defendants, to allow the proceedings to lie dormant for months, until other creditors proceed to collect their claims, and then, by consent of the attorney, attempt to gain a priority. *Matter of the National Mechanics' Banking Association* v. *The Mariposa Company,* 423

2. The rule which is applied to dormant executions should be applied to such proceedings, and the vigilant creditor should be allowed priority; especially when it is apparent, from all the facts in the case, that there has been collusion in regard to the prosecution of the claim of one creditor, to defeat the claim of the other. *ib*

*See* HUSBAND AND WIFE.

## CREDITORS' SUIT.

1. An action in the nature of a judgment creditor's bill is still allowable, under the Code. *Bartlett* v. *Drew,* 648

2. Hence a judgment creditor of a foreign corporation, after an execution has been returned unsatisfied, may bring a suit in equity against an individual having property of the corporation in his possession in this this State, to reach such property and subject it to the payment of the judgment. *ib*

## CRIMINAL LAW.

1. A party convicted of a misdemeanor, and sentenced to imprisonment, has a right to be heard upon an application to be let to bail, under the Revised Statutes, (1 *R. S.* 765, § 19, *Edm. ed.;*) even after the execution of the judgment has commenced; where a writ of error has been allowed, with a direction that it shall operate as a stay of the execution of the judgment. *The People* v. *Folmsbee,* 480

2. And he may, in the discretion of the justice before whom he is brought, on *habeas corpus,* be let to bail, in such a case, pending the decision of the court on the writ of error. *ib*

3. The office of a writ of *certiorari,* in a criminal case, issued under the provisions of the Revised Statutes, after trial and before judgment, is only to bring up the indictment, the

proceedings on the trial, and any bill of exceptions that may have been taken; and it presents for review only the questions arising on the indictment and bill of exceptions. *The People* v. *Reagle*, 527

4. In criminal cases, exceptions can be taken only on the trial, and to the rulings of the court as to the admission or rejection of evidence, or upon other questions presented on a trial before a jury, and not in any case to the judgment or order of the court upon a demurrer. *ib*

5. The remedy for an erroneous decision upon a demurrer is, in civil cases, by appeal; and in criminal cases, by writ of error. *ib*

6. The presiding justice at the oyer and terminer has no authority to discharge a jury, in the absence of his associates, whose presence is necessary to constitute a court of oyer and terminer. *ib*

7. The only thing which the presiding judge is authorized to do, in the absence of his associates, touching the business of the oyer and terminer, seems to be to take recognizances and bail. *Per* TALCOTT, J. *ib*

8. Where the jury, in a criminal case, after the cause was tried and submitted to them, separated without authority, and without having agreed upon any verdict; *Held* that this constituted no bar to another trial upon the same indictment. *ib*

9. The effect of modern decisions is, that irregularities whereby a lawful verdict is prevented, produce a mistrial, which is no bar to a new trial. *ib*

10. It is conceded, at this day, that the court may discharge a jury, in case of necessity, in a criminal case, without furnishing a bar to a new trial. That the court, in the exercise of its discretion, is to judge of the necessity and propriety of the discharge, provided there be any facts on which such discretion may be exercised. *Per* TALCOTT, J. *ib*

11. Where the jury, after the cause was committed to them, and before they had rendered or agreed upon a verdict, had separated without having been legally discharged; *Held* that, as any verdict in the case, to be afterwards rendered by that jury, would doubtless have been invalid, and set aside, there was a necessity for the exercise of the power of the court, in its discretion, and in furtherance of justice, to discharge the jury. And that, such power having been exercised by a competent court, the discharge constituted no bar to a new trial of the prisoner. *ib*

12. By the common law, husband and wife cannot be witnesses for each other. The provisions of the Code of Procedure do not apply to proceedings under the criminal law. And the act of 1869, (ch. 678,) allowing persons charged with crime to be witnesses in their own behalf, relates only to the party charged with crime. Hence, upon the trial of an indictment, the prisoner's wife is an incompetent witness for him.

## D

### DAMAGES.

*See* WARRANTY, 4, 5.

### DEBTOR AND CREDITOR.

1. The law devotes all the property of a debtor, both real and personal, to the payment of his debts; and if a debtor, instead of paying his debts, uses his personal property upon the real estate of another, so that it becomes part of such realty, for the purpose of defrauding his creditors, and preventing them from obtaining satisfaction of their demands out of his property, with the knowledge and consent of the owner of the realty, the judgment creditor may follow the property into the hands of the owner of the premises thus benefited, and fasten his judgment upon such premises, to the extent of the debtor's property therein. *Isham* v. *Schafer*, 317

2. If a debt has been created between the judgment debtor and the owner

of the real estate, the judgment will be fastened upon such debt, and the debtor of the judgment debtor will be decreed to pay the debt, to the judgment creditor. *ib*

3. But where no debt has been created between the parties to the fraudulent transaction, and the personal property of the judgment debtor has merged in, and become part of, the real estate of another, in this way, the appropriate, if not the only remedy, is to fasten the judgment upon the real estate, to the extent of the judgment debtor's property thus made a part of the realty. *ib*

4. In every such case, however, it must appear that the debtor has contributed something in the nature of property to the real estate of another—something which the creditor had the right to claim as property, and which could be appropriated and converted into money, by legal process, to satisfy a debt or demand. *ib*

5. If it was something else, for instance, the mere labor or skill of the debtor, gratuitously bestowed, no such relief could be had, on account of it. The law gives the creditor a lien and claim upon the property of his debtor—upon the fruits of his labor and skill, when received or earned—but no lien or claim upon his capacity to labor, or upon his skill and ingenuity. *ib*

6. There is a distinction between the *property* of a judgment debtor, as such, and his *gratuitous services* in managing his wife's business. *ib*

*See* CORPORATIONS, 6.
    CREDITORS.
    FRAUDULENT CONVEYANCES.
    HUSBAND AND WIFE, 1, 5, 6, 7, 8, 9.
    PRINCIPAL AND AGENT.
    VENDOR AND PURCHASER, 6.

### DEED.

*See* ADVERSE POSSESSION
    EJECTMENT.
    HUSBAND AND WIFE, 8, 9.
    LIMITATIONS, STATUTE OF.
    REFORMATION OF DEED.

### DIVORCE.

1. A decree of divorce, granted by a court in Ohio, where neither of the parties, in fact, resided at the time, without any appearance by the defendant, or notice to him, except the publication of a notice to appear, in a newspaper, is not valid and binding here, so as to annul a marriage solemnized in this State. (Following the decision of the Court of Appeals, in *Kerr* v. *Kerr*, 41 *N. Y.* 272.) *Phelps* v. *Baker*, 107

2. If such a decree contains a direction for the payment of alimony, it is void in this State, as to the alimony, whatever its effect may be upon the marriage; and will furnish no foundation for an action here to recover the alimony awarded by it. *ib*

### E

### EJECTMENT.

In an action of ejectment, where the defendant sets up as an equitable defense a mistake in a deed executed by him, under which the plaintiff claims, a court of equity would not attempt to make a decree altering the legal effect of such deed, unless the other parties to that conveyance, as well as subsequent purchasers for value, who have conveyed with warranty, were before it. *Cramer* v. *Benton*, 216

### EQUITABLE DEFENSE.

*See* EJECTMENT.
    EQUITY.
    LIMITATIONS, STATUTE OF.

### EQUITABLE LIENS.

1. An equitable claim on land, which existed prior to the recovery of a judgment, is given a preference over judgments docketed afterwards; but in no case is that preference given where the equitable right did not exist prior to the recovery of the judgment. *Cook* v. *Kraft*, 409

2. There is no principle of equity by which a purchaser of real estate,

or of a lease which, at the time of the purchase, is subject to the lien of a judgment, can claim that improvements subsequently made by him, although without knowledge of the judgment, are exempt from the lien. *ib*

3. If, when such lien exists, a party voluntarily expends money on the premises, the same become subject to the lien. *ib*

4. The principle upon which equitable liens are allowed to have priority is, that the contract was made before the docketing of the judgment. After that date, the property, with any subsequent improvements, is subject to the lien. *ib*

## EQUITY.

1. The provision of the Code allowing a defendant to set forth as many defenses and counter-claims as he may have, whether they be such as were formerly denominated legal or equitable, or both, seems to have been construed to embrace equitable causes of action affecting the equitable right of the plaintiff to enforce his legal cause of action; and probably such was the intention of the provision. *Per* TALCOTT, J. *Cramer* v. *Benton,* 216

2. In this enlarged sense, an equitable defense or counter-claim to a legal cause of action can mean nothing less than such a state of facts and parties as would induce a court of equity, in the exercise of its general jurisdiction, to interfere and restrain the prosecution of the action at law. *ib*

3. A court of equity only gives relief in cases where all the parties whose rights are to be affected, or who have a direct interest in the question to be determined, are before it. *ib*

4. When a defendant sets up and seeks an adjudication in his favor, upon an equitable defense or counter-claim, he is *pro hac vice,* in a court of equity, and must rely upon its principles, to maintain his claims. *ib*

See FORECLOSURE SUIT.
PARTITION, 1.
USURY, 3, 4, 5, 6, 7.

## ESTATE.

*See* LANDLORD AND TENANT.

## EVIDENCE.

1. Evidence of a conversation between the parties at the time the defendants delivered to the plaintiff a writing claimed to be a contract, was objected to, on the ground that what was said, at the time, was merged in the written contract. *Held* that as the plaintiff was proceeding on the theory that the writing was *not* the agreement, and that the conversation proved it was not, the evidence was admissible for that purpose. *Hoag* v. *Owen,* 34

2. In an action against husband and wife, brought by judgment creditors of the husband, to set aside conveyances made by the defendants, as fraudulent, the examination of the husband, taken in supplementary proceedings against him, instituted by another creditor, is legitimate evidence, so far as it affects the husband. *Lormore* v. *Campbell,* 62

3. But neither the testimony, the acts, nor the declarations of the husband can be used as legal evidence to implicate the wife, or to fix her conduct as fraudulent, or to divest her of her estate. And if such testimony is given, before a referee, it is his duty, upon the motion of the wife, to strike it out, if he does not intend to consider it evidence against her. PARKER, J., dissented. *ib*

4. In an action against husband and wife, brought by judgment creditors of the husband, to charge the separate estate of the wife with the judgment debt, the books of account of one B., (since deceased,) containing an account consisting of debt and credit, between B. and the husband, were offered for the purpose of proving that the latter had paid B. for materials which B. had furnished for a house the wife had built upon her land. *Held* that the books were clearly incompetent evidence, as against the wife; the account therein contained being between other parties. *Isham* v. *Schafer,* 317

5. In a case where it can be claimed that there is a doubt as to what a word, letter or figure, contained in an instrument, was intended to be, extrinsic evidence is admissible upon the question, and does not.infringe upon the general rule that parol evidence is not admissible to change or explain a written instrument; the object of the inquiry being to ascertain what the language of the instrument in fact is, and not to give it a construction. *Arthur* v. *Roberts,* 580

6. Although the question whether the dispute is to be determined by the court, or by the jury, does not necessarily arise in an action tried before a referee, performing the office of both court and jury, yet the sensible rule is, that the question is one of fact, for the jury; and such is the weight of authority. *ib*

7. When the question is about a figure, in the year of payment of a promissory note, the testimony of the person who drew the note, as to what the figure was intended to be, and that at the time of the making of the note the figure in question was read to the maker, as a cipher, is admissible.

8. In such a case, the reading of the note to the maker is part of the *res gestæ*, and proof of it admissible for that reason. *ib*

> *See* ANSWER.
> ASSAULT AND BATTERY.
> SEDUCTION.
> VENDOR AND PURCHASER.
> WILLS, 10, 11, 12.

EXCEPTIONS.

*See* CRIMINAL LAW, 4.

EXECUTORS AND ADMINISTRATORS.

1. In every case, when a complaint is made to a surrogate, under the provisions of the Revised Statutes, that the circumstances of a person appointed executor are so "*precarious*" as not to afford adequate security for his due administration of the estate, (2 *R. S.* 72, § 18,) it must depend upon its own peculiar features and circumstances; of which the surrogate is the appropriate judge. *Shields* v. *Shields,* 56

2. The circumstances of an executor are *precarious,* within the meaning and intent of the statute, only when his character and conduct present such evidence of improvidence or recklessness in the management of the trust estate, or of his own, as in the opinion of prudent and discreet men endangers its security. *ib*

3. Though bankruptcy might furnish a reason for superseding an executor, poverty does not. *ib*

4. The selection of a trustee is an indication of the highest degree of personal confidence; and character, rather than pecuniary responsibility, controls the selection. And it would be arbitrary, as well as unjust, for a court to adjudge that a person of sufficient capacity to make a will had not enough to select a trustee to manage the estate as executor. *ib*

> *See* ACCOUNT.

EXPRESS COMPANIES.

*See* CONSIGNOR AND CONSIGNEE.

F

FAST DRIVING.

*See* NEGLIGENCE.

FENCES.

1. The general rule that where a party is the owner of personal property which is upon the land of another, the former cannot commit a trespass by entering and taking it away, does not apply to that entry of a party which is necessary to enable him to make a partition fence between him and an adjoining owner. *Carpenter* v. *Halsey,* 45

2. The law compels each owner to make his portion; and this carries with it the right to such necessary occupation, for the time being, as is

required, to comply with such legal duty. *ib*

## FORECLOSURE SUIT.

1. According to the settled rule of equity, a mortgagee cannot, in an action to foreclose his mortgage, call in as parties, persons claiming in hostility to the title of the mortgagor, and have the legal title adjudged in the equitable action. The question of legal title is a question of law, and to be determined in an action of ejectment, at law. *Brundage* v. *The Domestic and Foreign Missionary Society*, 204

2. The plaintiff, on being applied to by W. to purchase a bond and mortgage given to W. by the defendant, declined purchasing, but agreed to take the same to sell, as a broker for the mortgagee, for a compensation agreed upon. The securities were thereupon assigned to him, by W., to enable him to negotiate and transfer a title to a purchaser, and for no other purpose, except that out of the avails of the sale he should retain enough to pay and satisfy a judgment he held against W., and release a levy. But after having obtained the assignment, he refused to sell and assign the bond and mortgage, but claimed to retain the same as his own property, without paying W. anything, and refused even to satisfy the judgment, or to release the levy. *Held*, 1. That the plaintiff had obtained no title to the securities which he could enforce against the mortgagor; and that in an action of foreclosure brought by him, the mortgagor could set up as a defense that he had paid the mortgage debt to the mortgagee, and taken a discharge from him. 2. That the plaintiff had acquired no right to, or equity in, the bond and mortgage, even to the extent of his judgment, which must be deemed to be satisfied by the levy, while the levy remained. *Hall* v. *Erwin*, 349

    *See* INFANTS, 4, 5, 6.
        PRACTICE, 5.

## FOREIGN CORPORATIONS.

    *See* CREDITORS' SUIT.

## FORFEITURE.

    *See* LANDLORD AND TENANT.

## FRAUD.

Fraud avoids all contracts, and transfers of title, into which it enters, at the election of the party defrauded. *Hall* v. *Erwin*, 349

    *See* AGREEMENT, 3.
        FORECLOSURE SUIT, 2.
        MAXIMS.
        VENDOR AND PURCHASER, 1, 2, 3, 6.

## FRAUDS, STATUTE OF.

    *See* AGREEMENT, 1, 2.

## FRAUDULENT CONVEYANCES.

1. A finding of fact, by a referee, that conveyances were made with intent to hinder, delay and defraud the future creditors of the grantor, when the whole case shows that there were then no creditors to be defrauded, is, in law, simply absurd, or rather, a legal impossibility. *Per* POTTER, J. *Lormore* v. *Campbell*, 62

2. Our statute of uses and trusts only makes conveyances fraudulent and void as against the creditors of the grantor at the time of the conveyance. *ib*

3. Even though a conveyance be voluntary, it may be upheld as against the subsequent creditors of the grantor. *ib*

    *See* HUSBAND AND WIFE, 8, 9.

## G

## GENERAL ISSUE.

1. Want of consideration could always be shown, under the general issue. Anything which tended to show that a party to an instrument never had a cause of action against the other party to it, was always competent

under a general denial of the cause of action alleged, and is so still. *Evans* v. *Williams*, 346

2. But this rule does not apply to the holder of negotiable paper, who takes it in good faith before it becomes due, in the usual course of trade. *ib*

### GOOD–WILL.

*See* PARTNERSHIP.

### GUARDIAN AD LITEM.

*See* PARTITION, 3, 4, 5.

## H

### HABEAS CORPUS.

*See* CRIMINAL LAW, 2.

### HIGHWAYS.

1. Highway commissioners are not authorized to make any order for the removal of encroachments, except in the case of a highway laid out according to the statute. *Christy* v. *Newton*, 332

2. Unless the highway has been laid out and recorded in conformity with the statute, there can be no proceeding by the commissioners of highways for an encroachment. *ib*

3. Nor will an action lie, in such a case, by the commissioners, to recover the penalties given by statute for neglecting to remove alleged encroachments on the highway, in obedience to the order of the commissioners. *ib*

4. Where an order, purporting to be made by commissioners of highways, was signed by two of them, only, and it did not appear from it that the other commissioner was notified to attend, or had any knowledge of the proceeding; nor was there anything to show that any preliminary steps, such as the statute requires,

had been taken; *Held* that the order was a nullity. *ib*

5. An order signed by two commissioners of highways, recited that all the commissioners had been notified to attend a meeting for the purpose of deliberating upon an application " to establish the old Allegany road as a public highway ;" *Held* that no such proceeding as that being authorized by the statute, the public could acquire no rights under it. *ib*

6. A highway, opened and worked for a short part of the distance, only, and not opened or worked, as described in the survey, or in any manner, on a particular portion thereof, until after the lapse of nearly fourteen years, from the time of its being laid out, ceases to be a highway for any purpose, at the place where it is not opened or worked. *ib*

7. In an action for wrongfully diverting a watercourse on the plaintiff's land, where the defendant justifies as overseer of highways, it is erroneous for the judge to instruct the jury that such diversion was unlawful, and that the plaintiff is entitled to recover the damages he has sustained by reason thereof; it being an instruction to the jury that the plaintiff is entitled to recover, and not a mere intimation of an opinion on a question of fact. *Moran* v. *McClearns*, 388

8. It is also error for the court to instruct the jury that if they should come to the conclusion that the defendant acted *maliciously* in diverting the water, to injure the plaintiff, then the latter is entitled to recover all the damages he has sustained; whether the defendant had a right to turn the water or not; this amounting to an instruction to the jury that notwithstanding a public officer may be fully warranted and duly authorized, in law, to do the act complained of, yet his motives are the subject of inquiry by the jury, and that if they come to the conclusion that his motives were selfish and sinister, then the act becomes unlawful. *ib*

9. Such a rule, determining the liability of public officers, not according to the lawfulness of their acts, but

according to what a jury may suppose to have been their secret motives, could not be tolerated. *ib*

*See* CONSTITUTIONAL LAW, 5, 6, 7.
LOCKPORT, (CITY OF.)
MUNICIPAL CORPORATIONS.

## HUSBAND AND WIFE.

1. Where a wife has an equitable interest in land conveyed to her husband, by reason of her having paid a part of the purchase money, such interest will be protected, as against her husband's *subsequent* creditors. *Lormore* v. *Campbell*, 62

2. Where a husband had a vested interest in the personal estate which his wife owned at the time of the marriage; *Held* that the subsequent reduction of it to his possession, even though a part of it came into his hands after the taking effect of the act of the legislature of 1848, " for the more effectual protection of the property of married women," did not change his title to it. *Briggs* v. *Mitchell*, 288

3. In respect to marriages occurring prior to that act, all the personal estate owned by the wife, at the time of the marriage, or acquired by her during coverture, if reduced to possession by the husband, immediately became his; unless there had been an agreement prior to the marriage, amounting to an ante-nuptial agreement; or, by some agreement between them afterwards, it became her separate estate; or was settled upon her by a post-nuptial settlement. *ib*

4. The *separate estate* of a married woman, is such property as is in some way settled upon her for her separate use, without any control over it on the part of her husband. *ib*

5. If the legal title to property is shown to have been in the husband, the *onus* is upon the wife, claiming it as her separate estate, to prove that it is such. This she cannot do, as against his creditors, by showing a conveyance to her, from the husband, without consideration. *ib*

6. A post-nuptial settlement, although it would be upheld in equity, as between the husband and wife, would be presumptively void as against antecedent creditors of her husband. *ib*

7. The wife cannot set up her equity in such a settlement, as against such creditors. *ib*

8. M. being indebted to his wife in the sum of $2120, for money received from her estate, and to other persons in a larger amount, and being insolvent, conveyed all his property, worth at least $4500, to L. for the purpose of securing the said sum of $2120 due to his wife; and L. thereupon conveyed the same property to M.'s wife. *Held* that the property conveyed so far exceeded in value the amount it was intended to secure, that it was of itself sufficient to authorize the holding that the conveyance was fraudulent as against the antecedent creditors of M. without the finding of *actual* or meditated fraud. *ib*

9. And it appearing that it was a conveyance of not merely enough to secure the grantor's wife to the extent of the moneys claimed to have been received by him, but of all the remainder of his estate, and more than sufficient for the pretended object; and that there was a quiet acquiescence, by the wife, that her husband should use her estate as his own; he mingling it indiscriminately with his own, in business, for a period of from twelve to nineteen years, without a recognition of its separate existence by even a written receipt, memorandum, or separate instrument; and without his ever having, during that period, accounted for interest or principal, or even talked about it, until his *bona fide* creditors were about to call for it; it was *further held* that this was a kind of trust or settlement that could not be recognized by any rule of law or equity, to stand against the rights of M.'s antecedent creditors. *ib*

10. A married woman, having a separate estate, may employ her husband, as her agent, to transact any or all of her business; and hence she may contract with him to do all her work, or any part of it, by the

job, for a stipulated price. *Fair-banks* v. *Mothersell*, 406

11. A married woman, being engaged in building a house on premises owned by her separately, let the digging of the cellar, and the laying of the cellar wall, to her husband by the job. The husband employed the plaintiff to plow and scrape and level off the lot, and he performed work of that kind, supposing the husband to be the owner of the property. No part of such work, however, was done upon the husband's job of digging and walling up the cellar. *Held* that the case stood simply upon an employment of the plaintiff by the husband, to work for his wife, upon her separate property, without any express-agreement whether he should be paid by the husband, or the wife. And that the wife knowing the plaintiff was at work there, and seeing the kind of work he was doing, the law would imply a promise, on her part, to pay for the services, if it was in fact her work. *ib*

See CRIMINAL LAW, 12.
DEBTOR AND CREDITOR.
EVIDENCE, 2, 3, 4.

# I

## INFANTS.

1. An infant defendant cannot, while an infant, waive the defect that he did not appear by guardian. *McMurray* v. *McMurray*, 117

2. It is not a mere irregularity to take a judgment against an infant defendant, without the appointment of a guardian *ad litem* for him. It is error in fact. *ib*

3. But as the writ of error has been abolished, there seems to be no other mode of obtaining relief against such a judgment than by motion to set it aside. *ib*

4. And if a judgment of foreclosure is obtained against infant defendants without any appointment of a guardian *ad litem* for them, the judgment is erroneous, and will be set aside,

as a matter of right, if the motion is made in proper time, *ib*

5. But as the omission to procure such appointment is not a mere irregularity, the infants are not bound to move at the earliest possible opportunity. *ib*

6. Where, however, infant defendants, instead of moving to set aside a judgment of foreclosure recovered against them, as soon as they severally came of age, delayed, respectively, about nine, seven and four years; it was *held* that innocent parties, who had in the meantime become interested in the mortgaged premises, ought not to suffer by the delay. A motion to set aside the judgment was therefore denied, but without prejudice to their right to bring an action of ejectment, or an action to redeem, in order to test their claim to set aside the judgment as being absolutely *void*. *ib*

See PARTITION, 3, 4, 5.

## INNKEEPER.

*See* BAILMENT.

## INJUNCTION.

1. Under the acts of the legislature requiring a license to to be obtained, for theatrical or dramatic performances, &c., in the city of New York, (*Laws of* 1839, *p.* 11; *Laws of* 1860, *p.* 999; *Laws of* 1862, *p.* 475,) an injunction will lie, to restrain impromptu performances, consisting of solos, duets and other songs, in a public place, or "garten," upon a raised stage or platform, by actors dressed in costumes adapted to the characters of the piece; for admission to which a price is charged. *The Society for the Reformation of Juvenile Delinquents* v. *Diers*, 152

2. Where, upon a motion to dissolve an injunction, the defendant, in his affidavits, sets up new matter, explanatory, or in the nature of a confession and avoidance, the plaintiff may read new affidavits, in reply thereto. *ib*

See PARTNERSHIP, 2, 3, 5.

## INSURANCE COMPANIES.

Where the charter of an insurance company authorized the company to receive notes for premiums, in advance, and declared that such notes should be deemed the absolute property of the company, and might "be used for the payment of losses and liabilities, and for any other purpose connected with the business of the company; and when negotiated and in 'the hands of third persons, shall not be subject to any equitable claim or offset;" *Held* that this authorized a transfer by the company of a premium note in absolute payment, or as security for the payment, of a valid debt of the company. *The Great Western Insurance Company* v. *Thayer*, 633

## INSURANCE, (FIRE.)

1. Where a policy of insurance against fire referred to the *application*, "for a more full and particular description, and forming a part of this policy;" and declared that the policy was made and accepted in reference to the terms and conditions therein contained and thereto annexed, which were declared to be a part of the contract; *Held* that by force of such reference, the application was made a part of the contract. *Shoemaker* v. *The Glens Falls Insurance Company*, 84

2. The conditions annexed required that applications for insurance should be in writing, and that any misrepresentation, concealment, suppression or omission of facts or circumstances known to the insured, increasing the hazard, should avoid the policy. The defendant, in an application for insurance upon premises covered by a mortgage, falsely stated that there· was no incumbrance thereon; and at the foot of such application covenanted and agreed to and with the insurers that "the foregoing statement is a just, full and true exposition of all the facts and circumstances in regard to the condition, situation, value and risk of the property to be insured, so far as the same are known to the applicant and are material to the risk." *Held* that this covenant was a *warranty*. *ib*

3. Whatever is expressly embraced in a policy, or in any condition or collateral instrument annexed thereto and made expressly a part of the contract, is a warranty in respect to the facts specified therein, or clearly referred to. *ib*

4. This rule applies to all substantial statements which relate to the risk, and not to matters merely stated incidentally. *ib*

5. When the question as to the materiality of a statement made by an applicant for insurance arises upon a representation unconnected with a warranty, the materiality of the statement presents a question of fact to be submitted to the jury. But when there is a specific inquiry in regard to incumbrances by mortgage, and the answer is positive, denying the existence of any mortgage upon the premises, the question of the materiality of the statement in respect to the risk is settled by the parties as matter of *contract*. *ib*

## INTERNAL REVENUE ACT.

1. The power of summary seizure and forfeiture conferred by the 74th section of the act of congress known as the *Internal Revenue Act*, upon the revenue officials, to be exercised at their discretion, is an extraordinary power, in derogation of common right. And if it can be maintained, consistently with that clause of the constitution which provides that no person shall be deprived of his property without due process of law, or consistently with that other provision which declares that the right of the people to be secure in their effects against unreasonable seizures, shall not be violated, the statute conferring it must be most strictly interpreted, and cannot be extended, as against the citizen, beyond what the language of the act imperatively requires. *Crosby* v. *Brown*, 548

2. It is only in case of contumacy in *refusing* to produce and exhibit the receipt for the license-tax which the person of whom its production is demanded has, that the seizure mentioned in section 74 of the act, is authorized. And the ·power con-

ferred, to seize, assumes that there is a receipt which may be produced.    *ib*

3. The authority to seize the property of a peddler, under that section, was only intended by congress to secure the production and exhibition to the officer of such receipt or evidence of payment as might have been issued to the peddler by the collector; and not to authorize a seizure in case the required special tax had not been paid.    *ib*

4. The right to seize and forfeit the team of a peddler is not conferred upon assistant assessors of internal revenue on account of the insufficiency, in their opinion, of the amount paid as a special tax, or for any defect which they may think exists in the form, or substance, of the receipt which has been issued by the collector, and which is produced and exhibited to them, on demand. *ib*

5. They are not called upon to exercise the judicial power of determining such questions, but only to act upon a patent fact within their own cognizance.    *ib*

# J

## JUDGE'S CHARGE.

*See* Highways, 7, 8.
Physicians and Surgeons, 10, 12, 16, 17.
Railroad Companies, 1.
Seduction, 3.
Use and Occupation, 6.

## JUDGMENT.

1. A judgment rendered by a court that has not obtained jurisdiction of the subject matter to which it relates, and of the persons to be bound thereby, is utterly void. *Phelps* v. *Baker*,    107

2. If there is any exception to the rule, it is to be found in cases in which the proceedings are *in rem*, and where, from the necessity of the case, it is exceedingly difficult, if not impossible, to discover the par-

ties owning or interested in, the property, and when delay for the purpose of bringing them into court, would result in the destruction of the property, or in a total failure of justice.    *ib*

3. It has been repeatedly held that when a suit is commenced by the attachment of property, the judgment recovered therein is valid, so far as the title to the property attached is concerned, but inoperative for any other purpose, as to the defendant who has not appeared, or been personally served with process. *Per* Mullin, P. J.    *ib*

4. This court has power to set aside a judgment, on motion, where it clearly appears that the plaintiff had no legal cause of action.    *ib*

5. The provision of the constitution of the United States which declares that full faith and credit shall be given, in each State, to the public acts, records and judicial proceedings of every other State (*art.* 4 § 1) applies only to judgments of the courts of any of the United States, where both parties are within its jurisdiction when the suit was commenced, and where the defendant was served with process, and had, or might have had, a fair trial of the cause.    *ib*

6. If a creditor give his debtor in execution permission to go at large beyond the jail, or its liberties, the judgment is absolutely discharged. *Bonesteel* v. *Garlinghouse*,    338

7. And this is so, even where the debtor agrees, in consideration of such permission, that he will still be bound by the judgment, and that the plaintiff may re-arrest him on another execution, in case he does not pay the judgment.    *ib*

8. All the cases go upon the ground that the debt is *satisfied* by the arrest of the person; and the judgment is of no further validity or force, if the plaintiff has consented to a discharge from the arrest. If the discharge is by the act of the law, it is otherwise. *Per* Johnson, J.    *ib*

9. The rule being thus settled that an arrest operates as a satisfaction of

the judgment, if the defendant is discharged therefrom by the act and consent of the plaintiff in the judgment, such judgment ought to be satisfied of record, instead of being allowed to remain of record, as an apparent .claim and cloud against the defendant. *ib*

10. Where the defendant, being arrested and imprisoned upon execution, was released and discharged from arrest, by the plaintiffs, upon his written promise " that such release shall not affect or impair my liability on the judgment in this action, or my liability to ,arrest after the appeal shall have been decided and the stay inoperative;" *Held* that the judgment was discharged; and that the defendant was entitled to have it vacated and discharged of record. *ib*

11. *It seems* the principle would be the same, even if it were shown that the action was brought by the plaintiffs in their official characters as commissioners of excise, and the recovery was for penalties incurred by the defendant by reason of his violation of the excise law. *ib*

*See* FORECLOSURE SUIT, 2.
INFANTS, 2, 3, 4, 5, 6.
TENANTS IN COMMON, 6, 7, 8.

## JURISDICTION.

Posting citations in public places within the jurisdiction of the court in which proceedings are instituted, cannot confer any legitimate jurisdiction over defendants who are nonresidents, and do not appear to answer, whether they have notice of the suit or not. The effects of such proceedings are purely local, and elsewhere they will be held to be mere nullities. *Phelps* v. *Baker*, 107

*See* CORPORATIONS, 2, 3, 4.
JUDGMENT.
PRACTICE, 4.
TRUSTS AND TRUSTEES, 1, 2, 3.

## JUSTICE OF SUPREME COURT.

*See* BENEVOLENT SOCIETIES.

## L

## LANDLORD AND TENANT.

A., being seised of an estate of inheritance, or freehold, capable of alienation or of being mortgaged, in certain premises, by virtue of a lease thereof to him for three lives, which contained a covenant against waste, and in which premises the plaintiff, his wife, had an inchoate right of dower, he, in 1860, executed a mortgage upon such premises, for $700. In 1869 that mortgage was foreclosed by an action in which the plaintiff was a party defendant. The premises were sold under the judgment therein, and the defendant U. becoming the purchaser, he sued out a writ of assistance and placed it in the hands of the sheriff. A. admitted that he had committed waste, by reason of which the lease was forfeited, and upon that pretext he surrendered the *possession* of the premises to the landlord; who thereupon leased the same to the plaintiff. On a complaint praying for a perpetual injunction, to restrain the sheriff and U. from interfering with the plaintiff's possession; *Held*, 1. That upon the execution of the mortgage, the mortgagee stood in the place, and possessed the rights of A., the lessee and mortgagor, subject to the condition in the mortgage, and subject to the equities of A. and to the reversion of the remainderman at the termination of the lives named. 2. That the landlord could not impair the rights of the mortgagee by any act of his; and his tenant, A., had no power, by any voluntary act of his, to forfeit the estate he had previously aliened by mortgage. 3. That to the extent of that mortgage, the mortgagee possessed rights that the remainderman could only obtain by legal steps, as against him. 4. That A. the tenant, could not by a mere confession of waste, to the landlord, and without judicial action, or giving the mortgagee his day in court, to protect or defend his rights, surrender up or convey away rights that he himself had previously aliened to another. 5. That the mortgagee possessed rights which A. could not confess away. 6. That this was

in effect the creation of a new estate, or an attempted creation, without the evidence of it being in writing. 7. That the surrender of an estate being required by statute (2 R. S. 134, § 6,) to be in writing, the calling it a forfeiture, and agreeing it shall be a forfeiture, cannot dispense with the requirements of the statute, or change its character. 8. That the plaintiff was foreclosed by the proceedings at law to which she was a party, and of which she had full and actual notice, and could not resist the proceedings therein to carry into effect the judgment against her right of possession. 9. That the condition in the lease, giving a right of re-entry in case of waste, was not a limitation of the estate which would authorize the landlord to take peaceable possession at its termination; but the estate was a conditional one, which could only be determined by a trial and adjudication upon the rights of all the parties in interest; or by the legal surrender of all the rights of all the parties in interest. *Allen* v. *Brown*, 39

### LEASE.

*See* LANDLORD AND TENANT.

### LIMITATIONS, STATUTE OF.

1. Where a deed was executed in 1846, more than twenty years before the commencement of an action of ejectment against the grantor, and in that action the defendant, for the first time, in any action or judicial proceeding, asserted an equitable claim to have such deed reformed, and its legal effect varied, on the ground of mistake; it was *held* that such claim was barred by the statute of limitations. *Cramer* v. *Benton*, 216

2. The right to demand relief, in such a case, is barred by the statute at the expiration of ten years from the time when the cause of action accrued; and the legislature, by permitting equitable defenses and counter-claims to be set up in defense to actions at law, did not intend to abrogate the statute of limitations, as to such cases. *ib*

3. It *seems* the same policy which prohibits the commencement of an action upon such a claim after the time specified in the statute, is equally applicable to the use of it as a defense, afterwards. *ib*

### LOCKPORT, CITY OF

1. The common council of the city of Lockport has the power, and it is it; duty, to make and repair crosswa.. in that city. Such power and duty are not left to be inferred, but are expressly given and imposed by the city charter. *Hines* v. *City of Lockport*, 378

2. If the common council, although cognizant of defects in a crosswalk, rendering it unsafe, gives no directions to any person or officer to repair the walk, it is guilty of neglecting a duty clearly imposed. *ib*

3. Besides the duty of repairing crosswalks, in terms imposed upon the common council, by the city charter, it has also the powers of commissioners of highways of towns conferred upon it, by the charter; and under that power, it is the imperative duty of the common council to cause crosswalks, &c., to be repaired; and if it is not done, the city is liable for whatever damages individuals may sustain by reason of such omission. *ib*

4. Although the language of the charter is permissive, "The common council *may* regulate, repair," &c., it may not omit, in its discretion, to perform the duty, without being liable for damages resulting from such omission. *ib*

# M

### MALPRACTICE.

*See* PHYSICIANS AND SURGEONS.

### MANUFACTURING CORPORATIONS.

*See* COPORATIONS.

## MARRIED WOMEN.

1. Where the debt, for which a promissory note is given by husband and wife, is the debt of the husband, the wife, in becoming a party to the note, is a mere surety for her husband. *Todd v. Ames,* 454

2. But if, in such a note, the wife charges and creates "a lien and claim" upon her " separate real and personal property, to secure the payment of the note," the promise is binding in law, and operates to create a charge upon, and to bind, such separate estate for the payment of the debt, and to subject it to execution in satisfaction of a judgment recovered upon the promise. *ib*

3. It is not material whether the separate property which the wife has at the time of the trial is the same as that which she had at the time of signing the note. *ib*

4. When a married woman creates a valid obligation, and makes it a charge upon her separate estate, it extends to her whole separate estate which she may have at the time of the trial and judgment. *ib*

5. As long as the obligation continues, her entire separate estate is devoted to its payment and discharge; unless the lien, or charge, is expressly limited and confined to some specific portion thereof. *ib*

*See* HUSBAND AND WIFE.

## MAXIMS.

*Ex dolo malo non oritur actio* is a maxim of very wide, if not universal, application. It applies even to the holder of commercial paper, and more strongly to assignees of choses in action. *Hall* v. *Erwin,* 349

## MENACES.

1. In order to avoid an act on the ground of menace of arrest or imprisonment, it must appear that the menace was of an unlawful imprisonment, and that the party was put in fear of such imprisonment, and was induced by such fear to do the act in question. *Knapp v. Hyde,* 80

2. It is not such menace as will avoid an act, if the party is only menaced by a lawful imprisonment. *ib*

*See* PROMISSORY NOTES, 1.

## MESNE PROFITS.

*See* USE AND OCCUPATION, 4, 5.

## MISTAKE.

*See* EJECTMENT.

## MISTRIAL.

*See* CRIMINAL LAW, 9.

## MORTGAGE.

1. A mortgage, given for a larger sum than is due to the mortgagee, is valid for the excess only in case no rights of third persons have intervened. *Bissell* v. *Kellogg,* 617

2. As against a subsequent *bona fide* mortgagee, such a. mortgage can only be a valid security for the amount due thereon at the time his rights as subsequent mortgagee accrued. *ib*

3. The foreclosure by advertisement of a mortgage tainted with usury will not operate to convey a good title, except to a *bona fide* purchaser at the advertised sale. And this can be prevented by giving notice of the usurious character of the mortgage, at the time of the sale. *ib*

*See* AGREEMENT, 1.
COMPLAINT, 2.
FORECLOSURE SUIT.
LANDLORD AND TENANT.

## MUNICIPAL CORPORATIONS.

1. When the common council of a city, or the trustees of a village, are made *commissioners of highways,* the duty to repair the streets be-

comes imperative; unless they not only have not funds applicable to that use, but have not by the charter power to raise them. *Hines* v. *The City of Lockport,* 378

2. Where it appeared that the charter of a city provided that $2500 of the moneys raised by the common council, might be used to defray the expenses of repairing and keeping in order the highways, &c., of the city, and that in addition to this sum, the proceeds of a poll-tax upon each male inhabitant above the age of twenty-one years, not assessed for real or personal property, should be applied to the repair of the highways; *it was held* that it must be assumed that funds sufficient to make all ordinary repairs of streets and crosswalks were furnished. And that, under these circumstances, it was incumbent on the city, when sued for neglect to repair, to show that there were not funds applicable to the repairs in question; and that unless a want of funds was proved, it was liable for the consequences of its neglect. *ib*

3. Where the charter of a city gave to the common council the power to cause streets, alleys and avenues to be opened and widened, and to be regulated, graded and paved, and from time to time to be repaired or regraded, and provided that "the expense of all new work or improvements and alterations not in the nature of ordinary repairs, shall be assessed and be a lien upon the property benefited, when completed, in sections or as a whole, and so certified to the comptroller, by the local assessors;" and the common council, by resolution, directed the city engineer to establish the grade of an avenue, from one specified point to another, at an expense not exceeding $2500, and directed the proper authorities to advertise for proposals for grading said avenue; *Held* that the latter clause of the above provision required the expense of the work in question to be assessed upon the property directly benefited thereby, and not upon the property of the city at large; the work contemplated being "new work," within the meaning of the charter, and not in the nature of "ordinary repairs." *Brenn* v. *The City of Troy,* 417

4. *Held, also,* that to justify a general tax upon the property of the city for a work or improvement in the nature of that proposed, two things were required by the charter: 1st. The work must not be new. 2d. It must be only an *ordinary repair.* *ib*

# N

## NEGLIGENCE.

1. Proof of driving in a public street, in a city, at the rate of a mile in three minutes and ten seconds, when the law limits driving to a mile in eleven minutes, is amply sufficient to charge the driver with the consequences that follow from such driving. *Moody* v. *Osgood,* 644

2. Where the jury, in an action to recover damages for a personal injury sustained by the plaintiff in consequence of being struck by the defendant's sleigh, and run over, through his negligence, had been charged that to render the defendant liable, the injury must have been occasioned solely by his wrongful act, and without any act of negligence on the part of the plaintiff; *Held* that this covered all that was proper to be submitted to the jury on that point; and that the questions whether the defendant could have avoided hitting the plaintiff, and whether, if the plaintiff had gone on when called to, she would have been injured, were mere matters of opinion, and were properly excluded. *ib*

*See* BAILMENT.
 LOCKPORT, (CITY OF.)
 MUNICIPAL CORPORATIONS.
 PHYSICIANS AND SURGEONS.
 RAILROAD COMPANIES.

## NEGOTIABLE PAPER.

*See* GENERAL ISSUE.
 PROMISSORY NOTES, 2, 3.

## NEW YORK, (CITY OF.)

*See* ASSESSMENTS.
 INJUNCTION, 1.

# O

## OFFICE AND OFFICER.

1. To constitute a person an officer *de facto*, a mere claim to be such officer, and exercising the duties of the office, are not sufficient. It is well settled that there must be color for the claim, and a colorable title to the office. *The Rochester and Genesee Valley Railroad* v. *The Clarke National Bank*,    234

2. An officer *de facto* is one who exercises the duties of an office under color of right, by virtue of an appointment, or election, to that office. He differs, on the one hand, from a mere usurper of an office, who undertakes to act as an officer without any color of right, and on the other, from an officer *de jure*, who is in all respects legally appointed and qualified to exercise the office.    *ib*

3. When the color of authority notoriously ceases, the reason for sustaining the acts of persons who are in possession of, and exercising the powers and performing the duties of an office, under color of authority, as the acts of officers *de facto*, ceases.    *ib*

4. When, by a judgment of the court of last resort, in a direct proceeding to determine the title of officers *de facto*, it has been adjudged that they have no rightful title to the office, but are mere usurpers, then, at least as to all who have notice of such proceeding and judgment, the color of authority has ceased; and this without regard to whether any body else has been inducted into the office or not.    *ib*

5. As officers *de facto*, there must be at least a presumption that they are rightfully in office. Such presumption cannot be said to exist after the decision of a competent tribunal to the contrary.    *ib*

*See* HIGHWAYS, 8, 9.

## OVERSEER OF HIGHWAYS.

*See* HIGHWAYS, 7, 8, 9.

## OYER AND TERMINER.

*See* CRIMINAL LAW, 6, 7.

# P

## PARTIES.

*See* ACCOUNT.
EJECTMENT.
FORECLOSURE SUIT, 1.
TENANTS IN COMMON, 5.

## PARTITION.

1. On partition in equity, the court will order an acounting, and dispose of all questions arising between the parties in relation to the land, and its use, and afford complete relief. *Scott* v. *Guernsey*,    163

2. In an action for a partition, the property consisted of village lots, and the referee held that it should be sold in separate lots, as it would thereby bring the most money. Some of the shares were small, some incumbered by judgments, and others reduced by liens for excess of rents received. *Held* that the decision that the property should be sold in parcels was not inconsistent with a finding that actual partition could not properly be made, and that a sale was proper.    *ib*

3. Where proceedings in partition were in accordance with the act of 1831, which authorized publication against infant defendants who were non-residents, it was not necessary to appoint a guardian, unless they appeared. *Clemens* v. *Clemens*,    366

4. The act of 1833, *it seems*, was not applicable to cases of non-residents; but it provided for cases where infant defendants were served and did not appear. In such cases, the court could, on application, appoint guardians for them.    *ib*

5. But even if guardians for non-resident infants who do not appear are necessary, the omission to appoint them is but an irregularity, which must be taken advantage of promptly. The objection cannot be raised by a purchaser, when the infants have for

some years been of age, and when a motion, if made, would be denied on account of the delay. *ib*

*See* ACTION.
TENANTS IN COMMON, 2.
TENANTS FOR LIFE AND IN REMAINDER, 1.

### PARTNERSHIP.

1. The good-will of a business firm is an important part of its property, and will be protected, by a court of equity, whenever a proper case arises. *Bininger* v. *Clark,* 113

1. Where it is alleged, and not denied, that it constituted the most valuable part of the partnership assets, any appropriation of it by one partner, to the exclusion of another, unless it is acquired upon a fair sale, is a wrong which will be restrained by injunction. *ib*

3. The defendant, Abraham Bininger Clark, having been a partner in the firm of "A. Bininger & Co." of which the plaintiff was also a member, he and his son, after the dissolution of the firm, commenced a similar business on their own account, in the adjoining store; putting upon the firm's late place of business a sign stating that "A. Bininger Clark & Son" had "removed to No. 96, next door below." They also distributed among the customers of the old firm, and printed in newspapers, circulars to the effect that they were the successors to A. Bininger & Co., and suspended across the street a banner, with the words "A. Bininger Clark & Son, successors to A. Bininger & Co." thereon, and put signs upon their store, to the same effect. The defendant A. B. Clark had never been previously known as "A. Bininger Clark," but as "Abraham B. Clark," and had always so signed his name. *Held* that these facts clearly showed that the partnership name of A. Bininger & Co. had been appropriated by the defendants; and an injunction restraining such appropriation or use was continued. *ib*

4. *Held,* also, that the fact that the defendant's name was "A. Bininger Clark," did not obscure the wrongful design, nor in any manner change the case. *ib*

5. And that neither the appointment of a receiver of the original partnership, upon its insolvency and dissolution, nor the assignment of the assets to an assignee in bankruptcy, affected the right of one partner in such firm to bring an action against another partner, to restrain the appropriation of the good-will, and name of the former firm ; he having an interest in protecting the property of such firm, so that its debts might be discharged, and possibly a surplus realized for his own use. *ib*

### PAYMENT.

*See* CONSIGNOR AND CONSIGNEE, 1, 2, 3, 4, 5, 6.
PRINCIPAL AND AGENT.

### PEDDLERS.

*See* INTERNAL REVENUE ACT.

### PENALTIES.

*See* COMMON SCHOOLS, 1, 3.
HIGHWAYS, 3.

### PHYSICIANS AND SURGEONS.

1. In an action against a physician and surgeon, to recover damages for negligence and malpractice in the setting and treatment of a dislocated limb, it is for the jury to say whether, upon the evidence, it is established to their satisfaction that the defendant did not use the means which experience has shown to be proper and necessary in order to justify a surgeon in assuming that he has restored the bones to their places. *Carpenter* v. *Blake,* 488

2. Where, after a dislocated arm has been attempted to be set, there is a protuberance at the elbow joint, plainly to be seen, such protuberance being evidence, to a surgeon, that the bones are not in their place, it is for the jury to say whether the failure of the attending surgeon to discover this evidence of the omission to restore the bones to their places is evidence of want of attention, or want of skill; and if it is

evidence of either, it is very significant. *ib*

3. Where the surgeon setting a dislocated limb did not use a sling, after the operation, and medical witnesses differed as to the necessity of a sling, in such a case; *held* that it was for the jury, after weighing the reasons assigned for and against the use of it, to say whether it was negligence in the surgeon to omit the sling, or not. *ib*

4. If writers on the treatment of dislocations, or if, in the absence of such authority, practical surgeons, prescribe a mode of reducing them, and of treating the joint after the bones are replaced, it is incumbent on surgeons called to treat such an injury to conform to the system of treatment thus established; and if they depart from it they do it at their peril. *ib*

5. If, in case of dislocation of the elbow joint, it is enough for the physician to replace the bones and to put the arm on a pillow, with the part below the joint at a right angle with that above it, and directing the application of cold water, it would seem to be proper, if not necessary, that the attending surgeon should inform the patient, or those in charge, of the necessity of maintaining that position; and if there is a tendency in the limb to become straight, or if there is great pain, rendering the patient nervous and restless, the danger should be disclosed, to the end that all proper precaution may be taken to prevent it. An omission to give the warning, in such a case, is culpable negligence. *ib*

6. Although it is the right of a surgeon to give up the care of a dislocated limb at any time, especially with the patient's assent, yet if he insists upon that assent as a shield from liability for any negligence of which he may have been guilty, or for any malpractice committed, it is competent for the plaintiff to show, if she can, that her consent was obtained by representations that were false; and if shown to be false, the consent is no protection to the defendant against liability for damages that had occurred before the consent was given. *ib*

7. In order to meet any defense resting on the plaintiff's consent to the defendant's discharge, it is not necessary to allege the falsity of the representations, in the complaint. But if the plaintiff intends to recover damages resulting from the omission to call in surgical aid because she relied on the false representations, it is necessary that they should be alleged in the complaint. *ib*

8. In an action against a surgeon for malpractice, it would be error to instruct the jury that it is not material whether the defendant was or was not skillful in his profession. *ib*

9. One holding himself out as a surgeon is liable as well for want of skill as for negligence; and the injured party may bring his action to recover for damages resulting from both, and recover on proving damages resulting from either. *ib*

10. Where the judge charged the jury, in an action for malpractice, that it was immaterial to the inquiry before them whether the defendant, at the time, was or was not reputed to be, or was or was not, a skillful surgeon; that the question was, did he bring to the treatment of the particular case that reasonable degree of skill ordinarily possessed by the members of the profession to which he belonged—the average skill of his profession; *Held* that by this language the judge must be understood to mean that if a surgeon does not bring to the treatment of an injury, or of a disease, the ordinary amount of skill possessed by those in the same profession, it is immaterial how high his standing may be; that if he has the skill and does not apply it, he is guilty of neglect; that if he does not have it, then he is liable for want of it; and that whether a surgeon possesses ordinary skill may be material in an action for malpractice, but not whether he possesses a higher degree of skill. And that so construed, there was no objection to the charge. *Aliter* had the plaintiff sought to recover on the ground that the defendant did not possess ordinary skill. *ib*

11. In such a case, the questions to be decided are, 1st. Whether the defendant possessed the ordinary skill

of persons acting as surgeons; and 2d. If he did, whether he was chargeable with negligence in not applying it in his treatment of the plaintiff. Whether he possessed greater skill, or had been successful in the treatment of other patients, is wholly immaterial. *ib.*

12. Where the judge charged the jury that it was impossible to show that a surgeon possessed the skill required, except by showing what skill he applied in the treatment of the particular case; it was *held* that if this part of the charge was to be construed by itself, without reference to other parts of it, the proposition could not be supported. But that if construed (as the context warranted,) as an instruction that the defendant was required to have an ordinary degree of skill, and whether he had any more was wholly immaterial, it was correct. *ib*

13. That a physician or surgeon possesses skill, may be shown by the testimony of members of the same profession who can speak from personal knowledge of his practice. When the point in issue is, whether skill was applied in a given case, the possession of skill, without proof that it was applied, would be no defense to an action for malpractice. But there may be cases in which such proof is admissible. *Per* MULLIN, P. J. *ib*

14. When it is proved that the surgeon has omitted, altogether, the established mode of treatment, and adopted one that has proved to be injurious, evidence of skill, or of reputation for skill, is wholly immaterial, except to show (what the law presumes) that he possesses the ordinary degree of skill of persons engaged in the same profession. In such a case, it is of no consequence how much skill he may have; he has demonstrated a want of it, in the treatment of the particular case. *ib*

15. The failure to use skill, if the surgeon has it, may be negligence; but when the treatment adopted is not in accordance with established practice, but is positively injurious, the case is not one of negligence, but of want of skill. *ib*

16. A refusal to charge that if the negligence of the plaintiff contributed to the injury, the defendant was not responsible, is not erroneous, when put upon the ground that there was no evidence, in the case, of the plaintiff's negligence; or, if there was any negligence, it was the result of ignorance on the part of the plaintiff as to how the injured limb should be treated, which ignorance it was the duty of the defendant to remove. *ib*

17. Where the judge charged the jury that a surgeon "contracts that he will bring to the case that ordinary and reasonable degree of skill which is possessed by the average of his profession;" that "he undertakes to bring to the case the exercise of that reasonable degree of skill ordinarily possessed by the members of the profession"—adding the remark— "I think it the reasonable rule that he is required to exercise the *average skill* of his profession;" *Held* that the judge having first laid down the rule correctly, a change of phraseology, in the latter part of the instruction, did not change the rule; it being obvious that in the last sentence he did not intend to modify or vary the rule previously stated. *ib*

18. If the case is a new one, the patient must trust to the skill and experience of the surgeon he calls. So must he if the injury or disease is attended with injury to other parts, or other diseases have developed themselves for which there is no established mode of treatment. But when the case is one as to which a system of treatment has been followed for a long time, there should be no departure from it, unless the surgeon who does it is prepared to take the risk of establishing, by his success, the propriety and safety of his experiment. *Per* MULLIN, P. J. *ib*

PLEADING.

*See* ANSWER.
COMPLAINT.
EQUITY, 1, 2.

POWER.

When a public body is clothed with power to do an act, which the public

interest requires to be done, and the means of performance are placed at its disposal, the execution of the power may be insisted on as a duty, notwithstanding the statute conferring it is only permissive. *Hines* v. *The City of Lockport,* 378

## PRACTICE.

1. If there is any foundation for the objection that a recovery has been had upon grounds not alleged in the complaint, it should be made in season. After judgment, it is too late for the unsuccessful party to avail himself of it. *Updike* v. *Abel,* 15

2. Under the system of practice established by the Code, in order to entitle a defendant to a new trial, on the ground that the plaintiff has not proved the case made by his complaint, it must appear that the cause of action is unproved in its entire scope. *ib*

3. When a nonsuit is moved for upon the whole case and evidence, and the right judgment or decision is rendered, it will not be set aside, as a general rule, upon exceptions to such decision, because an erroneous reason was given for denying the motion. But if the point presented for the motion be a sound one, it must be clearly avoided or overreached by other clear facts or points in the case; or else an exception to the erroneous ruling must prevail. *Shoemaker* v. *The Glens Falls Insurance Company,* 84

4. Service by publication is valid within the jurisdiction by whose laws it is authorized, but of no validity beyond it. *Phelps* v. *Baker,* 107

5. If a complaint be amended, a copy must be served on the defendant, and the right to answer is a substantial right. Hence the neglect to serve an amended complaint on infant defendants, in a foreclosure suit, is, at least, a great irregularity. But if too much time has elapsed, and too many innocent parties are interested, the judgment will not be disturbed on that ground. *McMurray* v. *McMurray,* 117

6. The 33d section of the Code, which provides that in case of the death of a sole plaintiff, the action may be continued in the name of his representatives or successor in interest, does not apply to a case where a sheriff sues as such, and dies during the term at which the action is tried, and his deputy is also dead. *Orser The Glenville Woolen Company,* 371

7. Such a case is provided for, however, by the Revised Statutes, which direct that "where an action is authorized or directed by law to be brought in the name of a public officer, his death or removal shall not abate the suit, but the same may be continued by his successor; who shall be substituted by the court, and a suggestion of such substitution shall be entered on the record." (3 *R. S.* 670, *5th ed.*) *ib*

See CREDITORS.
EVIDENCE, 5 to 8.
HIGHWAYS, 7, 8.
INFANTS.
JURISDICTION.
USURY, 1, 2.

## PREMIUM NOTES.

See INSURANCE COMPANIES.

## PRINCIPAL AND AGENT.

1. It is well settled that a debtor is authorized to pay to an agent any sum which is due upon a security which has been entrusted to the agent by the holder, for the purpose of collecting any part of it; as where the agent has been authorized to receive the interest, only, but receives the principal. *Doubleday* v. *Kress,* 181

2. Indeed the authorities go to the extent of holding a payment valid, made to an agent who is merely entrusted with the possession of the security, without express authority to receive or collect any part of it. The ostensible authority attributed to a party to whom is entrusted an instrument to secure the payment of money, is to receive payment according to its terms. *Per* TALCOTT, J. *ib*

3. The principal is, as to third persons, not having any notice of a limitation, bound by the ostensible authority of the agent, and cannot avail himself of secret limitations upon the authority and repudiate the agency, where innocent third persons have in good faith acted upon the ostensible authority conferred by the principal. *ib*

4. The plaintiff held a promissory note for $800 and interest, payable to her order, at the office of W., made by the defendant. When it fell due, the plaintiff, without indorsing the note, handed it to M. to present for payment. M., accordingly presented the note, at the place of payment, together with a forged order upon W. purporting to be signed by the plaintiff, requesting W. to pay her money to M. The principal and interest was thereupon paid, by W., and the note delivered up and canceled, and M. absconded with the $800. *Held* that the payment was clearly valid, both upon authority and principle, and discharged the note. *ib*

5. *Held, also,* that the fact that the note was not indorsed by the payee was of no importance. *ib*

6. Although an indorsement is requisite to render a note negotiable, it is not necessary to the validity of a payment. A delivery of the note, to the maker, is all that is required, upon the payment thereof, either to the payee or his agent. *ib*

7. The presentation, by an agent, of a spurious order from the payee, upon the maker of a note, for the amount due upon the note, the maker supposing the order to be genuine, cannot have the effect of invalidating a payment otherwise justified. *ib*

*See* CONSIGNOR AND CONSIGNEE.

### PRIORITY.

*See* CREDITORS.

### PROMISSORY NOTES.

1. Where the defendant, at the time of making a promissory note, was not under arrest or imprisonment, but was at his residence in this State, where he had committed no criminal offense for which he could be arrested or imprisoned; having made, at most, as was alleged by the payee, only some fraudulent representations in respect to the value of land upon which he had a mortgage that he had sold to the payee of the note; which sale, and the representations that induced it, were made in the State of Illinois; *it was held* that as there was no ground for the defendant's arrest, in either State, on a criminal charge, or for his being taken to Illinois in any criminal proceeding for such fraud, a threat of such an arrest constituted no defense to an action upon the note. *Knapp* v. *Hyde*, 80

2. Where, in an action upon a promissory note, the case does not show that the note was negotiable, its negotiability will not be presumed. *Evans* v. *Williams*, 346

3. If a note is not negotiable, the assignee takes it subject to all defenses of the maker against the payee; whether it be due at the time of the assignment or not; the same as the holder of a negotiable instrument does, who takes it after it has become due. *ib*

*See* ANSWER 3.
GENERAL ISSUE.
MARRIED WOMEN.
MENACES.
PRINCIPAL AND AGENT, 4 to 7.
USURY 1.

### PUBLICATION.

*See* PARTITION, 3.

## R

### RAILROAD COMPANIES.

1. In an action against a railroad company, to recover damages of the defendant, for causing the death of the plaintiff's intestate, a brakeman in its employ, by negligence, the defense was that the intestate was guilty of negligence, or want of

care, which contributed to his death, in being absent from his post, at the time, and omitting to apply the brakes. And the evidence rendered it more than probable that but for such absence, his life would not have been endangered. *Held* that it was erroneous for the judge to leave it to the jury to determine whether the intestate being absent from his post, warming or enjoying himself by a fire, was guilty of contributory negligence; whether the absence of a caboose did not authorize him to leave his post, in a cold morning; and whether the train being on an ascending grade, he had not a right to suppose his services were not as likely to be called in request as they would be on a downward grade. *Sprong* v. *The Boston and Albany Railroad Co.* 30

2. And that it being probable that the jury were influenced by these considerations, so submitted to them, it was a proper case for a new trial. *ib*

3. The defendants owned and operated two tracks between Syracuse and Rochester, upon different routes, one of which (the *Auburn* route) was longer than the other, and upon which forty-five cents more was charged, for passenger fare, than was charged upon the shorter route (via *Palmyra*.) The plaintiff purchased a ticket at Syracuse, for Rochester, which had, upon the face of it, the words "via Palmyra," paying therefor the lesser fare, and got upon a train bound for Rochester, by the Auburn route. Upon exhibiting his ticket, the conductor told him that he was on the wrong train; that he could not go to Rochester on that train unless he paid forty-five cents more; and that the ticket would carry him to F. (the next station,) and no further. The plaintiff said he expected to go through on that train, and would not pay any more. The conductor thereupon marked the ticket, with his punch, and returned it to the plaintiff. He again came to the plaintiff and asked him if he was going to pay the additional forty-five cents, and being answered in the negative, he told the plaintiff he must get off at F., and on arriving there, ordered the plaintiff to leave the train, and upon his refusal, put

him off the cars, as he was required to do, by his instructions. In an action to recover damages for such ejection, the referee reported in favor of the plaintiff, on the ground that the conductor, instead of punching the plaintiff's ticket, should have expelled him from the cars upon discovering that his ticket was by the other route, and his refusing to pay the additional fare. *Held*, that this was erroneous. That the conductor was under no obligation to the plaintiff to eject him from the cars, at any time before he should arrive at the point to which he was entitled to travel, on his ticket, so long as he persisted in remaining on the train. *Adwin* v. *The New York Central, &c., Railroad Co.* 590

4. That the plaintiff having taken this train through his own fault or inattention, his voluntary continuance upon it, after being fully notified of the consequences, must be deemed an election, on his part, to abide by the regulation of the company, since it was one lawful and proper to be made and to enforce. *ib*

## RECEIVER.

*See* CREDITORS.

## REFEREE.

*See* REPORT OF REFEREE.

## REFORMATION OF DEED.

1. To constitute a defense to an action of ejectment on the ground that the language and legal effect of a deed differs essentially from the intent of the parties, a case must be presented which would induce a court of equity to interpose and reform the defective instrument; not that it is absolutely necessary, in such a case, that a judgment reforming the instrument should be pronounced, if the defendant is content to waive, or does not demand, such full relief. For the judgment that he recover in the action is giving him the full effect, so far as the title to the premises in controversy is concerned, of

a reformation of the deed. *Cramer* v. *Benton,* 216

2. But the court, before rendering such a judgment, should have before it the same facts and parties as would enable it to pronounce a decree for reformation. *ib*

*See* EJECTMENT.

## REPLEVIN.

*See* CONSTITUTIONAL LAW, 9.

## REPORT OF REFEREE.

A report of a referee, directing that a public street be opened through property cannot be sustained; but the court may order a sale of lots, with a reserved lane or right of way, common to the lots sold. *Scott* v. *Guernsey,* 163

## RES ADJUDICATA.

1. The fact of *res adjudicata* is not to be made out by inferences. An estoppel requires strict proof. A fact cannot be held to have been adjudicated in a former suit, unless it so expressly appears by the record, or, at least, it is clearly shown by *evidence aliunde,* that it was determined. *Bissell* v. *Kellogg,* 617

2. Where there is a trial by the court, the judge who tried the cause, being required, in settling the case, to specify the facts found by him, and his conclusions of law, the facts thus specified are conclusive upon the parties, in that case, if founded on sufficient evidence; and there is no reason why they should not be considered as *res adjudicata* for all purposes, the same as though contained in the original findings of the judge. *ib*

3. Where it appeared by the record of a former recovery, that the question whether a certain mortgage was executed upon a usurious contract was in issue in that case, and that the fact of usury was found by the judge; *it was held,* in a subsequent action, brought by the defendant in the former suit and his privy in

estate by subsequent grant, against the plaintiff in the former suit, to remove such mortgage as being a cloud upon the title, that such record was admissible in evidence, in behalf of both the plaintiffs, as against the defendant, to show, and conclusively established, that such mortgage was usurious and void. *ib*

*See* COURT OF APPEALS.
OFFICE AND OFFICER, 4, 5.

## RES GESTÆ.

*See* EVIDENCE, 8.

# S

## SEDUCTION.

1. In action by a father, to recover damages for the seduction of his daughter, evidence of a promise of marriage, made by the defendant to the daughter, previous to the seduction, is inadmissible. *Whitney* v. *Elmer,* 250

2. If such evidence is offered in chief, by the plaintiff, and admitted as general evidence in the cause, without qualification or limitation, it is cause for reversal. *ib*

3. The judge instructed the jury that "if they found that the defendant promised to marry the plaintiff's daughter, before he had sexual intercourse with her, they were at liberty to consider that, with other circumstances attending her seduction; and they might also regard it as one of the circumstances of the case, in determining the damages to be recovered by the plaintiff, not for the purpose of giving damages for a breach of promise of marriage, but as one of the circumstances attending, and under which the seduction of the daughter was effected." The defendant's counsel excepted to this instruction, and requested the judge to instruct the jury that the plaintiff was not entitled to recover any additional damages on account of the promise of marriage; which request the judge refused. *Held* that the defendant was entitled

to the instruction asked for, in view of the fact that evidence of a promise of marriage had been admitted, and of the ambiguous character of the instruction on that subject actually given. *ib*

## SHERIFF.

*See* PRACTICE, 6, 7.

## STATUTES.

1. A statute authorizing the election of an additional justice of the peace in a city, conferred upon the justice to be elected thereunder, jurisdiction in all civil and criminal cases, and over all persons arrested or charged with any offenses, and all the jurisdiction, power and authority in *such cases*, which were possessed by the justices in said city then in office; and provided that all laws governing the justices of the peace in said city should apply to, and be binding upon, said justice; but made no provision for a clerk. *Held* that no power to nominate or appoint a clerk was granted by the statute, and that the court could not extend the statute by construction. *Cassidy* v. *The City of Brooklyn,* 105

2. A subsequent statute devolved the power of appointing clerks of justices of the peace upon the common council. The charter of the city provided that the mayor and board of aldermen, together, should form the common council, and that all ordinances and resolutions passed by the board of aldermen must be presented to the mayor for his approval. *Held* that the concurrence of the mayor was requisite to a valid appointment of a clerk. *ib*

*See* ASSESSMENTS, 1, 7, 18.
BENEVOLENT SOCIETIES.
CONSTITUTIONAL LAW.
CORPORATIONS, 1.
CRIMINAL LAW, 1.
INJUNCTION, 1.
INTERNAL REVENUE ACT.
PRACTICE, 6, 7.
TRUSTS, &c. 5.
USURY, 5.
WILLS, 15, 16, 17, 18.

## STREETS.

*See* ASSESSMENTS.
LOCKPORT, (CITY OF.)
MUNICIPAL CORPORATIONS.
TROY, (CITY OF.)

## SURROGATE.

*See* EXECUTORS AND ADMINISTRATORS.

## T

## TAXES AND TAXATION.

*See* MUNICIPAL CORPORATIONS.

## TENANTS IN COMMON.

1. One tenant in common in possession of the common property is only liable to pay rent, when he agrees to pay it; and such an agreement only enures to the benefit of the co-tenant with whom it is made. Nor can he set off against such rent the cost of improvements and additions not strictly repairs. *Scott* v. *Guernsey,* 163

2. A tenant in common occupying without agreement to pay rent, is not liable, on partition, to account for rent, even though the occupancy be by a firm of which the tenant in common is a partner. *ib*

3. A tenant in common receiving rents is liable to pay interest on the sums so received, without a previous demand. *ib*

4. The rent so received is a lien on the shares of the parties receiving it, in favor of the parties to whom it is due. *ib*

5. If one tenant in common, to whom one or more co-tenants is or are indebted for rents, dies, his administrator is a proper party to an action for partition and an accounting. *ib*

6. Whether, in the case of a voluntary partition, between tenants in common of lands, which has been consummated by conveyances to each, of his share, in severalty, when no

question is raised in regard to the fairness and equity of the partition, a court of equity has not power to compel a creditor having a lien on an undivided interest, by judgment or mortgage, before such partition, to resort to the share so partitioned to his debtor, for the satisfaction of his lien, and restrain him from enforcing such lien against the shares so partitioned and conveyed to the other tenants? *Quære. Martin* v. *Wagener*,                435

7. Where several agreements and conveyances between the heirs of a person dying seised of land, were not in the nature of a partition of the estate, and were not·intended to be a partition, but were mere contracts of bargain and sale, and conveyances thereon, and the plaintiffs conveyed their interests in the common lands to R. M., and· thus subjected them to the lien of a judgment existing against him, in exchange for a conveyance of an interest in other lands also incumbered by·the same judgment; it was *held* that the plaintiffs having done so voluntarily, and without any mistake, or ignorance as to the facts, the court, upon a complaint alleging that R. M. had disposed of all the property he received in and by said exchange, which was amply sufficient to satisfy the judgment, and that he was insolvent and unable to restore the same, or procure restitution thereof, could not relieve them from the consequences of their own act, by decreeing the lands conveyed to them by R. M. to be free from the lien of such judgment, and restraining the sale thereof upon execution issued on such judgment.                *ib*

8. *Held, also,* that, other judgments against R. M. having been enforced, and his title to the lands which were conveyed to him by the plaintiffs, and all the other lands held by him in severalty, having been alienated in executing the judgments, and the title vested in different purchasers, it became a mere question as to the order in which the lands subject to the lien of the original judgment should be sold, or made liable to contribution to such judgment; and that the order was regulated by statute. (2 *R. S.* 375, §§ 70, 71.)   *ib*

## TENANCY BY THE CURTESY.

*It seems* that tenancy by the curtesy still exists, as prior to 1848, where the wife dies intestate, or without ''devising land held by her. *Scott* v. *Guernsey*,                163

## TENANTS FOR LIFE, AND IN REMAINDER.

1. One entitled in remainder, as co-tenant, during the life estate, by permission of, and agreement with, the life tenant, erected buildings on the common property, and received rents for the same, before and after the termination of the life estate. *Held* that on partition he could not hold the buildings, or their value, and must account for the rents received after the death of the life tenant. · *Scott* v. *Guernsey*,                163

2. Nor will equity support such a claim, where the co-tenant has, by the rents received during the life estate, been fully reimbursed for all his expenditures and interest.   *ib*

3. A tenant for life, and one of the remaindermen, erected buildings on the common property, procured insurance thereon, and gave a premium note. After the death of the tenant for life, the remainderman was assessed on the note and paid the assessment. *Held* that in accounting for rents received, he was not entitled to an allowance for the premium thus paid.        *ib*

## THEATRICAL PERFORMANCES.

Songs and duets, sung by persons in in costume, may be parts of a dramatic, theatrical or operatic entertainment, and must be so regarded, when connected with dialogue and sung in a public garden, for admission to which a charge is made. *The Society for the Reformation of Juvenile Delinquents* v. *Diers*, ·   152

*See* INJUNCTION, 1.

## TRESPASS.

*See* FENCES.

## TRUSTS AND TRUSTEES.

1. Where a *cestui que trust* resided in this State, and the original trustee, although he died in Connecticut, resided in this State when he was appointed, had the trust fund here, at the time, and partly executed the trust here; and the *cestui que trust* was an infant and needed the fund for his support; it was *held* that, under these circumstances, the power of the court to appoint a new trustee within its own territorial jurisdiction could not be doubted. *Curtis* v. *Smith*, · 9

2. *Held, also,* that the Supreme Court was not divested of jurisdiction by the removal of the former trustee from the State, although he took the fund with him; the *cestui que trust* continuing to reside here. *ib*

3. Although, under some circumstances, the removal of a trustee from the State will authorize the court to displace him, and appoint a new trustee, and it may be necessary for the new trustee to be re-appointed in the foreign State and to become one there, to reach the fund; yet these considerations are aside from the question of jurisdiction, and they cannot be urged by a party having no interest in the fund. · *ib*

4. The facts that a trustee was appointed on petition merely, and not by bill; that the *cestui que trust* was not a party to the proceeding; and that other persons, contingently interested in the trust fund were not made parties, are mere irregularities, at the most, and do not touch the validity of the appointment; and the objections cannot be set up by persons not appearing to have any interest in the trust fund, but only *claiming* an interest, the nature of which is not shown. *ib*

5. The statute devolving a trust upon the court, on the death of a surviving trustee, and authorizing the appointment of a new trustee, (1 *R. S.* 730, § 68,) applies to a trust of personal as well as real estate. *ib*

6. Where one of two trustees disclaimed acting as trustee, by an answer in chancery, in Missouri; *Held* that his subsequent death, without ever assuming the trust or claiming a right to act, made valid that disclaimer, and vested all the estate in the surviving trustee, and the *cestuis que trust* were bound by the decree in that suit. *Clemens* v. *Clemens*, · 366

*See* AGREEMENT, 3.
WILL, 1.

# U

## USE AND OCCUPATION.

1. To enable a party to maintain an action for use and occupation, under the provision of the Revised Statutes authorizing such an action to be brought under any agreement, whether by deed or parol, the conventional relation of landlord and tenant must exist. *Thompson* v. *Bower*, 463

2. Unless that relation exists between parties, there is no implied promise or obligation to pay for use and occupation. *ib*

3. Where one occupies under an agreement to purchase, he is not a tenant, but a vendee, and the relation that of vendor and vendee, and in no conventional sense that of landlord and tenant. · *ib*

4. Distinction between the action for *mesne* profits and the action for use and occupation. *ib*

5. Where the relation of landlord and tenant did not exist, and there had been neither a tortious entry, nor a tortious holding, by the defendant, who went into possession by virtue of a parol agreement with the plaintiffs to purchase, and had been willing to pay substantially according to the agreement, and had quitted the premises because the plaintiffs refused to allow him to perform his agreement, or to accept performance on his part; *Held* that the plaintiffs could not recover for the use of the premises; whether the action was to be regarded as an action for use and occupation, or an action for *mesne* profits. *ib*

6. *Held, also,* that it was erroneous for the judge to charge the jury that the agreement under which the defendant entered, for the purchase of the land, being void, the plaintiffs were entitled to recover the fair value of the use of the premises.    *ib*

### USURY.

1. Where, in an action upon a promissory note, the single question to be tried is, whether there was a corrupt and an usurious agreement made upon a loan of money which was the consideration of the note, the *intent* of the parties is a question of fact; and that question having been found by the jury against the defendants, upon conflicting evidence, their finding is conclusive; unless some error was committed on the trial, by the judge, in his rulings, or charge to the jury. *Horton* v. *Moot,*    27

2. Whether the transaction was a contrivance on the part of the plaintiff, by which he obtained more than seven per cent for the loan or forbearance of money; whether it was a fraud upon the statute, or an evasion of the statute, to cover usury; whether the plaintiff bought the note of the bank at which it was payable; or whether the bank acted as the agent of the plaintiff, in committing the fraud—are not questions of law, independent of the facts upon which the propositions are based. And if the jury find, correctly, against the defendants upon them, the court cannot reverse their findings.    *ib*

3. Where the usurious character of a mortgage has been determined in, and appears by, the record of a former suit, there is no necessity for a bill *quia timet,* to entertain which is discretionary with a court of equity. *Bissell* v. *Kellogg,*    617

4. This principle is applied to obligations void for usury, notwithstanding the imperative provisions of the act of 1837.    *ib*

5. The usury act, of 1837, was not designed to require a court of equity to entertain a suit which, according to its settled practice, it would not have entertained before that act, but

only to relieve a borrower, under a usurious contract, from the obligation to repay the money actually borrowed, in cases where a resort to a court of equity was *necessary* either for discovery or relief.    *ib*

6. The former rule of courts of equity, requiring a complainant who sought relief in that court against a usurious contract, obligation or security, to repay the money actually loaned, with interest, as a condition of granting the relief, was abrogated by the statute of 1837 only in behalf of the *borrower.* The rule is not abrogated as to the *grantee* of the borrower. When such grantee, as such, commences a suit for relief, the rule requiring him to do equity, as a condition of relief, still applies. *ib*

7. If there is no offer by him, before suit, or in his complaint, to do equity, according to the practice of the court, the omission to make such offer, now goes only to the question of costs. If the defendant, to secure his equitable rights, has been compelled to defend the suit, and to appeal, he is entitled to his costs.    *ib*

*See* MORTGAGE, 3.

# V

### VENDOR AND PURCHASER.

#### 1. *Of real estate.*

1. In an action by a purchaser, against the vendor, to recover damages for fraudulent representations of the latter, upon a sale and purchase of land, the evidence showed that during the negotiations the plaintiff informed the defendant that he would not purchase lands held under a tax title; and that the defendant represented that he "had good title, and the best kind of title" to the lands in question; that they had been selected as choice lands, many years before, by one who had great opportunities of locating choice lands, and that such person had conveyed some of the lands so selected by him, to his brother, and the latter had conveyed them to the defendant. The falsity of the representations was clearly proved, and the

judge charged the jury that there was no dispute that the lands were held by the defendant under tax titles; and that if the defendant made the representations proved, knowing that the title was a tax title, it would be fraud. *Held* that the charge was correct; and that a verdict having been rendered for the plaintiff, in accordance with it, and upon the weight of evidence, a new trial was improperly granted. *Updike* v. *Abel,* 15

2. Words used by a vendor, during a negotiation for the sale of land, respecting the title, and susceptible of sustaining a separate allegation of fraud, in the complaint, but not inserted therein, may be used as evidence to sustain the allegations that are contained in the complaint, if employed during the same conversation with the latter allegations, and incapable of separation from them. *ib*

3. Evidence of representations made by the vendor, equivalent to those charged in the complaint, may be received. Proving those not alleged is only proving the *animus* of those that are alleged. *ib*

4 An agreement by parol having been made between the plaintiff and the defendants, for the sale of a dwelling house by the latter to the former, and the possession thereof, the plaintiff paid the purchase money. A writing was subsequently executed by the defendants, and delivered, but it did not contain all the agreement. And upon the plaintiff objecting to it, and returning it, on the ground that it did not provide for giving him possession, the defendants virtually admitted the fact, by not denying it, and agreeing to make it all right. *Held* that the defendants having received the plaintiff's money upon an agreement to give him possession, equity and common justice demanded that they should make him good by returning the money, or giving possession according to agreement. *Hoag* v. *Owen,* 34

5. *Held, also,* that the jury having found that the writing was not a conveyance to the plaintiff, he was not bound to reconvey the building to the defendants before bringing an action to recover back the purchase money he had paid. That it was sufficient for him to demand possession, or a return of the purchase money. *ib*

### 2. *Of personal property.*

6. On the 17th of October, 1866, the plaintiff, being the owner of a large quantity of wool, sold the same to A., F. & W. on a credit of four months, upon their notes. A., F. & W. were insolvent, at the time, and the wool was purchased by A., one of the members of the firm, with knowledge of such insolvency, and with a preconceived design not to pay for the wool. On that day ten sacks of the wool were delivered to the purchasers, and on the next day twenty-one sacks more were delivered. On the 19th of October the plaintiff refused to deliver the remainder; and on that day A., F. & W. made an assignment of all their personal estate, including the wool which had been delivered, to T. & R., to secure liabilities of the assignors to them, and to pay laborers and operatives. The wool delivered was immediately put into the mill of the purchasers, and at the time the assignment was made, the ten sacks delivered on the 17th, and more than one half of the twenty-one sacks delivered on the 18th, had passed the first process of manufacture, and were at different stages of manufacturing into under garments. On the same day, after the execution of the assignment, the defendant, claiming under the assignees, took possession of the wool, at the said mill. On the 22d of October the plaintiff demanded the twenty-one sacks of wool, of the assignees, claiming the right to rescind the sale and reclaim the property, on the ground of fraud. And, before the defendant or either of the parties to or for whom the assignment was executed had paid any money or wages, the same demand was served upon the defendant. *Held,* 1. That the purchase of the wool by A., F. & W. having been fraudulent, the delivery of the property to them gave them no title to it. 2. That the assignment was fraudulent and void as against the plaintiff. 3. That the plaintiff had the right to have the sale rescinded, unless he had, by some act of omission or commission,

lost his *status* and was thus deprived of the power of making complaint; the burthen of showing which was upon the defendant. 4. That the assignees, T. & R., were not in law absolute and *bona fide* purchasers, and their title was no better than that of their assignors. That the assignment itself was evidence that they were not absolute purchasers, but merely trustees of the property assigned. 5. That the wool had not, by the acts of the fraudulent purchasers in mixing the same with other wool and commencing the manufacture thereof, lost its identity, and become changed into a new product, before the transfer by the assignees to the defendant, so as to prevent the plaintiff from rescinding the sale and reclaiming the property. 6. That the defendant was not a *bona fide* purchaser, and could claim no protection as such. *Joslin* v. *Cowee*, 48

7. It is only innocent purchasers who purchase property converted into a different species that can be protected; and not even an innocent purchaser is so protected, who takes the title from a trespasser or wrongdoer; because the trespasser had none to give. *ib*

8. The owner of the original material may still retake it in its improved state, or he may recover its improved value. *ib*

See AGREEMENT, 1, 16, 17.
USE AND OCCUPATION, 1, 3.
WARRANTY.

# W

## WARRANTY.

1. If a thing be ordered of the manufacturer, for a special purpose, and it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose. *Park* v. *The Morris Axe and Tool Company*, 140

2. The plaintiffs being manufacturers of steel, and the defendants manufacturers of axes, the former wrote a letter to the latter, in which they offered to sell them ten tons of best axe cast steel, which they would warrant equal in quality to any brand of English cast steel. The defendants replied that they were going to try and use the plaintiffs' steel; that what they had used worked very well; and ordered ten tons. The plantiffs, in answer to this letter, said: "We will warrant ours to be equal in quality to Jessup's, or any other standard brand." The steel being sent, proved to be of an inferior quality. *Held* that the case was brought within the principle above stated; and that the referee was justified in finding a warranty that the steel would make as good axes as the best English steel. *ib*

3. *Held, also,* that the name of the defendants' company being "Axe and Tool Company," this was notice to the plaintiffs of the use to which the steel was to be applied; and the warranty must be held to be that the steel would make either axes or tools of as good quality as the best English. *ib*

4. And that the measure of damages, for a breach of the warranty, was the difference in value between the axes made from the defective steel, and their value if the steel had been equal to the best English steel. *ib*

5. In this class of warranties, the measure of damages is, the difference between the value of the defective article made from the defective material furnished, and the value of the article if made from the material as represented. *ib*

See INSURANCE, (FIRE.)

## WATERCOURSE.

See HIGHWAYS, 7, 8, 9.

## WILL.

### 1. *Validity.*

1. Where objects of a trust, in a will executed in Missouri, as to charity, as to accumulation, as to the limitation for more than two lives, &c., were clearly void, under our laws, and could not be enforced here; and these provisions were so connected with the whole trust, and dependent

upon their connection with the residue, that no part of the trust could be carried out without working injustice, and giving to a portion of the testator's family a larger share of the estate than was intended, if the whole trust could have been sustained; *Held* that the testator's objects would be much better accomplished by declaring the whole will void than by sustaining only small portions of the instrument. *Clemens* v. *Clemens*, 366

### 2. *Mental capacity of testator.*

2. The question as to the degree of mental capacity requisite to enable a testator to make a valid will, has of late received so much discussion, and particularly in the Court of Appeals in the cases of *Delafield* v. *Parish*, (25 *N. Y.* 9;) *Van Guysling* v. *Van. Kuren*, (35 *id.* 70;) *Tyler* v. *Gardiner*, (*Id.* 559,) and other cases, that it only remains for the courts to apply the law to particular cases as they arise. *Per* E. D. SMITH, J. *Kinne* v. *Johnson*, 69

3. The rule as laid down in *Delafield* v. *Parish*, and concurred in and asserted in other cases—viz., that a testator must have a sufficient mind to comprehend the nature and effect of the act he is performing; the relation he holds to the various objects of his bounty; and to be capable of making a rational selection among them—is now the established rule, as to the measure of mental capacity requisite. *ib*

4. The "sound mind" required by the statute, to qualify a person to make a will, cannot be satisfied by any different rule. *ib*

5. A testatrix, 83 years old, went, of her own accord, to the office of a lawyer, informed him that she wanted him to draw her will, and dictated the terms thereof, of which he then made a memorandum. This memorandum, of itself, showed intelligence, memory, judgment and discrimination in regard to children, grandchildren, and other friends, and the character and situation of her property, remarkable for a person of her age, and amply demonstrated her capacity to make a will. The will was drawn by the attorney, from such memorandum, and was read over to the testatrix, a few weeks afterwards, and having been corrected or altered in a few particulars, by her, was duly executed. The two attesting witnesses, who had known her, the one 30 and the other 38 years, both testified that they saw nothing, at the time of the execution of the will, indicating that the testatrix was of unsound mind; and one of them was of the opinion "that she was more than ordinarily smart for a woman of her age." And such was the concurrent testimony of most of the witnesses. *Held* that so far as the objection to the will was based upon the ground of the incapacity of the testatrix to make a will, it was unsustained and unfounded. *ib*

### 3. *Undue influence.*

6. The objection, to a will, that the testator, at the time of. making it, was under undue influence and restraint, always implies that he had sufficient mental capacity to make a valid will, but that the will in question was not his own free and voluntary act, but was in fact a will imposed upon him by others. *Kinne* v. *Johnson*, 69

7. The will is set aside, or is refused probate, in this class of cases, on the ground that it is not an honest will—that it does not reflect the unbiased intent and wishes of the testator, but on the contrary, had been extorted or procured from the deceased in the weakness and imbecility of old age or disease, by artifice, deceit or imposition, or by persistent importunity amounting to a species of coercion or moral duress. *ib*

8. Undue influence, in this sense, is a *fraud.* The will is set aside upon the principle that its execution was procured by fraud and imposition, and that for that reason and upon that ground, it is not the act, deed or will of the deceased. *ib*

9. Upon no other ground has a court any right to set aside a deed or will executed by a person of sane mind and memory, when the execution of the same was not procured, and the free agency of the party overcome, by some constraint, coercion, duress or force. *ib*

10. Facts and circumstances which, in this case, were held insufficient to establish undue influence over a testatrix who was 83 years of age, in the execution of a will.          *ib*

11. When a large portion of the property of a decedent is given, by his will, to one standing in a fiduciary relation to the testator, the circumstance is suspicious, if it does not furnish a ground for the presumption that undue influence was exerted or fraud practiced upon the testator in procuring the execution of the will.          *ib*

12. In such a case, proof should be given to satisfy the court that such position and relation was not abused, and that the will was the clear and free act of the party, unaffected by any improper influence.          *ib*

13. The force of the objection that a devisee under a will stood in a fiduciary relation to the deceased depends very much upon the extent of the intimacy of the personal relations between the parties, and the circumstances attending the execution of the will.          *ib*

14. The influence arising from gratitude, affection or esteem, is not *undue*. To make it undue influence, it must be such as practically to destroy free agency.          *ib*

4. *Construction of, in particular cases.*

See *Scott* v. *Guernsey*, 163.
    *Brundage* v. *Domestic and Foreign Missionary Society*, 204.

5. *Statute of Wills; construction of.*

15. Considering the evident purpose and policy of section 52 of the statute of Wills, (2 *R. S.* 66,) the mischief intended to be remedied, and the fact that it is a remedial statute, to be liberally construed, its meaning is, to prevent the lapse of a devise or bequest to a descendant of the testator, although the proposed devisee or legatee shall have died before the testator; provided such devisee or legatee shall have left lineal descendants, who shall be living at the testator's death; and this whether the death of the proposed devisee or legatee shall have occurred before or after the date or making of the will. *Barnes* v. *Huson*, 598

16. This interpretation is fortified by several decisions in the English court of chancery upon the construction of the corresponding section of the English statute of Wills, (1 *Vict. ch.* 26, § 33,) in which it has been held that whether the death of the devisee occur before or after the making of the will, is of no importance.          *ib*

17. In such a case, evidence that the testator had heard a rumor of the death of one of his children, before the making of the will, is wholly immaterial. The statute leaves open no door for dispute on that subject, or for the introduction of such proof.          *ib*

18. The words "shall die," in section 52 of our statute, is not to be construed as referring to a time intermediate the making of the will and the death of the testator.          *ib*

See ACTION.

WITNESS.

See CRIMINAL LAW, 12.

WRIT OF ERROR.

See CRIMINAL LAW, 5.

END OF VOLUME SIXTY.